[No. G030585. Fourth Dist., Div. Three. Dec. 23, 2002.]

In re JACOB S. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
MARIA S., Defendant and Appellant.

**COUNSEL**

Kathleen Murphy Mallinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, and Mark R. Howe, Deputy County Counsel, for Plaintiff and Respondent.

Sylvia L. Paoli, under appointment by the Court of Appeal, for Minors.

**OPINION**

**O'LEARY, J.**—Maria S. appeals the order terminating parental rights to her children Autumn, Noah and Jacob, on the grounds that: (1) termination of parental rights will substantially interfere with the siblings' relationships with each other; and (2) the court erred in finding Noah was adoptable. We disagree and affirm.

I

Maria S. is the mother of five children: Jessica, age 14, Autumn, age 11, Noah, age 9, Jacob, age 6, and Matthew, age 3.[1] In August 2000, the Orange County Social Services Agency (SSA) petitioned to have the children declared dependents after Maria checked herself into a hospital for mental health treatment without first assuring adequate supervision for Noah, who is a quadriplegic and requires around-the-clock care. Noah's 28-year-old cousin, Cara S., told the social worker she first realized Maria was gone when she heard Noah crying for Maria early in the morning. Cara stated that while the nurses changed shifts she was alone with Noah and believed this created a dangerous situation because she is not adequately trained to care for him. In addition, Cara reported Maria had been suffering from severe depression for the past three weeks and twice seemed intoxicated while caring for the children. Maria stated she drank wine to help her relax. She went to the hospital because she was experiencing "flu-like symptoms" and hearing whistling and a voice saying, "Happy Birthday." She told the social worker that she believed it was a "religious experience." SSA's subsequent investigation revealed that Maria often slept for most of each day and had used controlled substances in the past. During the investigation, the children lived variously in foster and group homes, with the exception of Noah who remained in a medical facility. The children had regular visits with their mother.

A more detailed version of the events leading up to the permanency hearing and the SSA's investigation is provided in our earlier unpublished decision relating to this case, *Maria S. v. Superior Court* (Feb. 21, 2002, G029876).) Suffice it to say, evidence from the six- and 12-month reviews showed Maria loved her children, but she sometimes had difficulty setting limits for them and dividing her attention equally among them. SSA initially recommended reunification services between the mother and children, but at the 12-month review the social worker recommended termination of those services based on Maria's failure to see her therapist regularly and to complete a substance abuse program. The social worker claimed Maria often failed to apply appropriate parenting techniques, did not reenroll in a parenting class when requested, and was sometimes late for visits with the children.

---

[1] This appeal only concerns Autumn, Noah and Jacob. Reunification efforts are continuing for Matthew. Jessica, the oldest, has objected to the permanency plan and wishes to stay with her mother.

The court agreed with SSA's recommendation, terminated reunification services, and set a Welfare and Institutions Code section 366.26[2] hearing (permanency hearing) that occurred on April 29, 2002. The court terminated parental rights to Autumn and Jacob and determined adoption for Noah was probable, but that he was difficult to place. The court set another hearing for six months later to determine Noah's adoptability. These rulings are at issue in this appeal.

During the permanency hearing, evidence was presented by both sides relating to the relationships between the siblings and how those relationships might be affected by termination of parental rights. The children lived their entire lives together prior to being placed in alternative care in August 2000. After they were removed, Jacob and Matthew lived together in a foster home for more than a year until Jacob was moved to his paternal grandparents' home.[3] Autumn and Jessica, the two oldest, lived together at various times before Autumn was also moved to her paternal grandparents' home in November 2001. While in foster care, they shared a room together, and they also lived together in a group home.

SSA reported that Autumn and Jessica shared the closest sibling bond. While Jessica was not a subject of the permanency hearing, Autumn said she missed Jessica very much and would be very sad if she never saw Jessica again. The two shared some friends, and as the two oldest children had shared experiences of caring for their younger brothers. Both sisters took part in looking after Noah, particularly in the first three months after he returned from the hospital when there was no nursing care. Maria testified Autumn and Jessica formed a particularly close bond at that time, and Jessica became Autumn's "favorite person." The two girls would often confide in each other.

Autumn testified she missed past times spent with Jessica. She and Jessica used to work together to take care of their brothers, performing such tasks as cooking for them and changing their diapers. Autumn would sometimes dress up in Jessica's clothes. She was happy to see Jessica at visits, although it had been a long time since she had seen Jessica. At one time Jessica expressed a desire to live with Autumn in their grandparents' home. Autumn wanted Jessica to live there because she thought they would have fun there together. After moving in with her grandparents, Autumn wrote two letters to Jessica, but was unable to send them because she did not know Jessica's

---

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3]Autumn, Noah, and Jacob have the same father, Aaron S. Matthew's father is Gregory G. and Jessica's father is Thomas B.

address. While Autumn said she missed her brothers, she said she would like to see Jessica more than anyone else.

The girls also exhibited typical sibling conflict. Autumn and Jessica had fights that could be intense, although Autumn added she did not care about the fights and thought they were "fun." Apparently, the fights took place around the time Autumn moved in with her grandparents. The social worker testified Autumn was angry with Jessica and did not want to see her. At the time of the hearing, Autumn said Jessica was being "bossy and grumpy," and while they were together in foster care Jessica had stopped talking to Autumn and had started talking to an older girl. The social worker said Jessica was not always agreeable to maintaining relationships with her siblings, and Jessica and Autumn exhibited signs of sibling rivalry.

Both Autumn and Jacob clearly wanted to maintain relationships with their siblings. They enjoyed visiting their siblings and missed them at times, such as when they or their siblings could not attend visits. The grandparents appeared willing to help maintain the relationships between the siblings. They said that they will continue to visit Noah even though they wish to adopt only Autumn and Jacob. The social worker said SSA would encourage Noah's continuing relationship with his siblings if he were adopted, and agreed that sibling relationships could be maintained even if parental rights were terminated.

## II

■ Maria asserts section 366.26, subd. (c)(1)(E), provides an exception to termination of parental rights if the termination would substantially interfere with the child's sibling relationships. The parties first dispute whether Maria has standing to assert the exception.

■ At the time the parties briefed this case, no court had decided whether a mother has standing to assert the exception. That changed with *In re L.Y.L.* (2002) 101 Cal.App.4th 942 [124 Cal.Rptr.2d 688]. There, the court reasoned that because "an immediate and substantial consequence results to the parent's legally cognizable interest in the relationship with his or her child" when the exception is found either to apply or not apply, a parent does have standing to assert the exception. (*Id.* at p. 951.) We find the court's reasoning persuasive and conclude Maria is entitled to raise this issue in this appeal.

## III

The "sibling bond exception" contained in section 366.26, subdivision (c)(1)(E), provides an exception to termination of parental rights when

"[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." The parent bears the burden of showing that a sibling relationship exists and that its severance would be detrimental to the child. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 952.) The existence of a relationship alone is not enough, but it must be "sufficiently significant" to cause detriment on termination. (*Ibid.*) If the court finds that there is a substantial detriment, it must "weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Ibid.*) We review the record for substantial evidence to support the court's findings. (*Id.* at p. 953.)

*In re L.Y.L.* is one of only a handful of published cases addressing the sibling bond exception and the only one to actually apply it. The court there found that the two siblings involved "were very close," that they loved one another, and that the sibling for whom parental rights were being terminated would miss her brother and worry about his safety if he continued to live with their mother. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 952.) The siblings had also lived together most of their lives. (*Ibid.*) Despite these findings, the sibling bond exception did not apply. (*Ibid.*) The court found "no evidence [the child], other than being sad, would suffer detriment if the relationship ended." (*Ibid.*)

We find *In re L.Y.L., supra,* instructive to a point. However, we do not believe that a child's "sadness" can never satisfy the substantial detriment test. "Sadness" is often all a young child can express. While an adult witness might be able to differentiate between, "This will make me sad, but I can deal with it," and "This will devastate me; I can't imagine life without my sibling and I don't think I want to live without him or her," a child is likely to describe both as making him, "sad." Both Jacob and Autumn have said that they will be "sad" if they never see their siblings again.

In this case there is evidence of strong sibling bonds, particularly between Autumn and Jessica. Autumn is 11 and Jessica is 14, and until Autumn began living with her grandparents the two always lived together. It goes without saying that the longer two children live together, the greater the chance they will establish a strong sibling bond. Autumn was very clear at the hearing that she feels very close to her sister.

The sibling bond exception also requires the court to look at "significant common experiences" the children may have shared and existing close bonds. Autumn and Jessica were more than just playmates. They confided in one another and assumed leadership roles at a very young age when their mother was unable to take care of them or their brothers. Autumn stated there was never much time to play while living with their mother, because she and Jessica would spend most of their free time performing domestic chores. Autumn's testimony leaves the impression the girls worked together to get themselves and their brothers through difficult times, and this type of shared experience usually leads to strong bonds. While the social worker painted a picture of sibling rivalry and hostility, Autumn testified that the fights between her and her sister do not matter to her—she claims they are "fun." Despite the occasional fighting, she still missed her sister and wished to maintain a relationship with her. It is likely that Autumn would suffer a detriment if she never saw Jessica again.

It is less clear that Jacob would suffer a similar detriment. At his young age, he is less capable of articulating the depth of his emotions than is Autumn. In a case where the strength of a bond between very young siblings is difficult to determine because of the young age of the children involved, court-ordered sibling bond studies may be appropriate. Such studies would be helpful—in some cases might even be indispensable—in determining the applicability of section 366.26, subdivision (c)(1)(E).

However, in this case, we need not decide whether sibling bond studies would have been appropriate. Assuming there would be substantial detriment to Autumn, Jacob, and Noah if parental rights are terminated, the court reasonably concluded that such detriment is outweighed by the benefits of adoption. There is no realistic expectation that within a reasonable time these siblings could live together under the same roof.

When asked, both Autumn and Jacob stated they do not miss living with their mother. Autumn is doing better in school, and both she and Jacob clearly enjoy living with their grandparents and have adapted quite well to the new environment. It is especially important that Noah, with his disability, find a home that can provide adequate care. These concerns outweigh whatever sibling bond exists between the children.

There are additional factors beyond termination of parental rights that will determine whether Jessica and Autumn have a continuing relationship. Autumn herself testified that even while they were living together in foster care Jessica started spending more time with girls her own age. There is also the natural rift created by the fact that Jessica wants to stay with her mother

and Autumn does not. Whether this relationship continues will depend largely on whether Jessica wants it to, and not as much on whether parental rights are terminated.

There is also no evidence that the relationships between any of the siblings will necessarily cease upon termination of parental rights. The grandparents have said they want to continue a relationship with their grandson Noah, and they are open to maintaining ties between Autumn and Jacob and their siblings. The grandparents have done so thus far, and there is no evidence they intend to stop once they have adopted Autumn and Jacob. Substantial evidence supports the court's determination that the sibling bond exception does not apply.

## IV

■ Maria contends there is no evidence to support the court's finding that Noah is adoptable. We agree with SSA that such a contention is premature, as the court has not yet decided whether Noah is adoptable.

The court did not find that Noah is likely to be adopted, but only determined that adoption was probable and that Noah is difficult to place because of his disability. Under such circumstances, section 366.26, subdivision (c)(3), provides that a court may "identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days."

Because of Noah's disability and the fact that an adoptive home for him has not yet been found, the court took advantage of section 366.26, subdivision (c)(3) to set another permanency hearing in 180 days, at which time it will determine whether Noah is adoptable. The outcome will largely depend on whether an adoptive family has been found for Noah. At that time, the court will make its final determination as to Noah. Until that final determination is made, Maria's contention is not ripe for review.

The judgment is affirmed.

Bedsworth, Acting P. J., and Moore, J., concurred.