[No. G037715. Fourth Dist., Div. Three. June 15, 2007.]

In re Y.R. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
N.M., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(c) and 8.1110, this opinion is certified for publication with the exception of part II.C.

COUNSEL

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**ARONSON, J.**—N.M. (mother) appeals the juvenile court's order terminating her parental rights to Y.R., age eight, and Daniel R., age five. (See Welf. & Inst. Code, § 366.26; all further unlabeled statutory citations are to this code.) Mother contends the juvenile court erred in concluding the children were likely to be adopted and she asserts the court should have sua sponte evaluated a maternal aunt in Arizona for placement. We conclude substantial evidence supports the juvenile court's adoptability finding and the court had no independent duty to evaluate the maternal aunt for placement after the aunt ceased contact with Orange County Social Services Agency (SSA). We therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The Department of Children and Family Services (DCFS) in Los Angeles removed Y. and Daniel at ages five and three, respectively, from mother's Long Beach apartment in September 2004 after reports of domestic violence between mother and the children's stepgrandmother. DCFS's earlier intervention efforts had failed, and mother's methamphetamine abuse remained unresolved. The Los Angeles County Superior Court sustained jurisdiction over both children (§ 300, subd. (b)), and transferred the case to the Orange County Superior Court (§ 375) because mother had moved to Buena Park.

Mother made little progress on her case plan by the six-month review hearing in March 2005. She missed her scheduled drug tests, failed to participate in counseling, and skipped half of her parenting classes. Vicente R. (father) remained incarcerated in Oklahoma, with an expected release date in May 2005. A maternal aunt in Arizona, Susan C., expressed interest in the children provided she would receive financial assistance and mother would not live with them. SSA initiated a referral under the Interstate

Compact for Placement of Children (ICPC) with the Arizona social services agency to evaluate Susan's suitability to care for the children.

Meanwhile, Y.'s and Daniel's annual physicals showed them to be healthy and "on target" developmentally and cognitively. SSA had moved the children to a new foster placement, where Y.'s behavior improved. She had masturbated in public for a month, used profanity, and acted aggressively towards Daniel and her peers in her prior placement, but these tendencies dissipated in the new home, where she and Daniel adjusted well and were affectionate with their caretakers. Y.'s kindergarten teacher described her as a "nice girl," but expressed concern she performed "significantly below grade-level." SSA subsequently authorized a tutor.

Father reentered the children's lives upon his release from jail. Although the social worker commended his love for the children, he proved to be a destabilizing influence. He tested positive for illicit substances several times, admitted a history of drug dealing, and suffered a drug overdose during the reunification period. Y., who had seen father arrested previously, feared the park police would throw him to the ground on their outdoor visits. Father insisted on bringing his girlfriend to visits, though she faced incarceration for a probation violation and the children reacted poorly to her. The juvenile court had ordered that the children have no contact with the maternal stepgrandmother due to her violent outbursts, but father created scenes in front of the monitor and the children by arranging for the grandparents to show up at visits. He also violated a court order by discussing the court proceedings with Y., bringing her to tears.

Mother fared no better in her reunification efforts. She bit Daniel on the arm to discipline him for biting Y.; mother's bite resulted in a red and purple bruise three to four inches in diameter. After SSA sought to impose a monitor on mother's visits, she ceased visiting for months at a time. Y. and Daniel were bewildered and hurt by her absence. Mother continually called father on his cell phone during *his* visits, heightening the children's anxiety. Mother and father fought verbally and exchanged epithets on a three-way telephone call with Y. on her birthday, driving her to tears. The child blamed herself for the conflicts between the parents.

Y. and Daniel responded by acting out in their placement. Their foster caretaker described "difficult behaviors such as tantrums (i.e.[,] kicking, yelling, stomping feet and slamming doors) when they are angry or do not get their way." The caregiver observed that "the children are quick to apologize and say they love[d her]," but she had a house full of other foster children and requested a new placement for Y. and Daniel. The caregiver noted Y. would walk in on older girls while they were showering and attempt to touch

their breasts. The social worker referred Y. to counseling, where she expressed feelings of anger and abandonment toward her parents, stating "they are liars" and "they don't care." SSA placed Y. and Daniel in an interim sibling assessment facility for three months, where they adjusted and improved their behavior gradually. They continued to miss mother, who never visited. SSA moved the children to a new placement in December 2005 when a foster home that could accommodate siblings became available, and no further incidents of misbehavior were reported.

Just before the children commenced this latest, ultimately final, foster placement, the juvenile court conducted the 12-month review hearing. In the previous six months, mother had borne a child by her 16-year-old consort, admitted drug use while pregnant, misled the social worker about her housing, skipped scheduled drug tests, and failed to visit Y. and Daniel. Father proved unable to extricate himself from his dependence on drugs, nor could he provide a stable residence for the children. The juvenile court terminated reunification services for the parents and set a permanent plan selection and implementation hearing (.26 hearing) for March 2006.

In the interim, the social worker reviewed SSA's attempts to place Y. and Daniel with their maternal aunt Susan. Arizona social services had approved Susan for placement in August 2005, but mother and father objected to out-of-state placement. When reunification prospects dimmed, the court postponed the 12-month review hearing so SSA again could explore placement with the aunt by having the Arizona authorities conduct a home study on Susan's new apartment. Then, in November 2005, Susan informed SSA *she* was moving to California to reside with her former in-laws due to difficulties parenting her "out of control" adolescent daughter, and she could not take responsibility for Y. and Daniel. But at mother's urging, SSA recontacted Susan, who claimed she had "exaggerated" her daughter's difficulties and the pair would remain in Arizona. Upon learning Susan planned a trip to California over the Christmas holiday, the social worker offered to make arrangements for a visit with Y. and Daniel. The worker also requested Susan contact SSA if she wanted the children placed with her.

Susan never contacted the worker about a Christmas visit or placement of the children. Mother informed the worker that she no longer had contact with Susan. The ICPC referral for placement of the children in Arizona expired in February 2006, but the social worker remained open to initiating a new referral if Susan expressed interest in the children and her stability improved. On the eve of the .26 hearing scheduled for March 2006, mother stipulated that SSA had undertaken "reasonable efforts . . . to complete whatever steps are necessary to finalize the permanent placement of the child[ren]."

The permanency planning assessment SSA prepared for the March hearing described Y. as an attractive, affectionate, and talkative seven-year-old girl who shared a close relationship with her brother Daniel. Her doctor reported she was overweight but otherwise in good health. Y. faced "definite academic deficits." Enrolled in second grade, she performed at kindergarten level but school district bylaws prohibited holding her back consecutive years. Y. underwent psychological testing to determine if she qualified for special education services. Daniel, an affectionate and intelligent four year old, awaited an opening in a Head Start program.

At the .26 hearing held on March 22, 2006, the juvenile court delayed selecting and implementing a permanent plan for Y. and Daniel. Proceeding under section 366.26, subdivision (c)(3), the court concluded termination of parental rights would not be detrimental for the children, but found only "a probability" of adoption because Y. and Daniel were "difficult to place for adoption" within the meaning of the statute and no prospective adoptive parent had been identified. (§ 366.26, subd. (c)(3).)[1] Accordingly, the juvenile court entered an order continuing the matter for 180 days for SSA "to locate an appropriate adoptive family for the minor[s]." The order included the court's finding that SSA had provided reasonable services to date.

Within a month, Donald and Brenda M. approached SSA about adopting two children. The couple had been married 10 years and wanted to start a family together. SSA placed Y. and Daniel with the M.'s in June 2006. After the new parents struggled initially with unspecified "behavioral problems" involving Y., they redoubled their efforts and soon concluded they could "not imagine not having the children in [their] home." They recognized the challenges parenting posed, and in particular that Y.'s problems might resurface, but they were committed to adopting both Y. and Daniel. Over the next several months, the family bonds melded, the children referred to the prospective adoptive parents as "mom" and "dad," and Donald and Brenda reciprocated the children's desire to stay with them "forever."

A social worker prepared a new permanency planning assessment for the rescheduled .26 hearing, now set for October 2006. The worker described Y., who had just turned eight years old, as an affectionate, talkative, pretty child with big brown eyes and long hair. The worker observed: "Y. . . . is

---

[1] Subdivision (c)(3) authorizes the court to deem a child "difficult to place for adoption" *only* if the child is a member of a sibling group, suffers a diagnosed medical, physical, or mental handicap, or is seven or more years of age. (§ 366.26, subd. (c)(3).) The first criterion applied to Y. and Daniel as siblings, and the third applied to Y., who was seven years old at the time of the March hearing.

cooperative, is very clean and neat, and likes to assist with simple household chores. She is able to play appropriately and cooperatively with children her own age and likes Barbie dolls, Brat dolls, swimming and riding her bicycle. The child is healthy and there are no medical concerns." The worker noted the structure and routine in Donald and Brenda's home "helped to settle the child's past acting out behaviors," and the extra time the prospective adoptive parents spent with Y. was "paying off in relation to the child's school-work." Y. continued to experience "academic deficits" but was "doing much better" and Brenda worked closely with Y.'s teachers to ensure her progress. Y. had already received a "Student of the Day" award twice by October and, unlike her past placements, she made friends in class and in the neighborhood. The social worker presented a similarly positive assessment for five-year-old Daniel, a "very healthy," intelligent, well-behaved kindergartner.

The juvenile court held the .26 hearing on October 6, 2006. Father did not appear. The court admitted SSA's reports for the previous review period, and mother declined to cross-examine the social worker. Mother also stipulated that Donald and Brenda would testify they were "fully committed to adopting the children, . . . desire to complete the adoption and . . . love the children and want them to remain with them forever as their own." The court also admitted several exhibits introduced by mother, including Y.'s individualized education plan prepared by her teacher and an early e-mail Brenda sent SSA concerning difficulties with Y.[2]

Mother contested Y.'s adoptability based on the child's past behavioral problems. Mother also noted the prospective adoptive parents' initial hesitation might recur, in which case mother contended adoption was unlikely for Y., and similarly unlikely for Daniel as part of a sibling set. The juvenile court disagreed, concluded the children were likely to be adopted, and terminated parental rights. Mother now appeals.

## II

## DISCUSSION

A. *Mother May Challenge the Juvenile Court's Adoptability Determination*

At the hearing on March 22, 2006, the juvenile court found the statutory conditions necessary for continuing the .26 hearing existed, namely that (1) terminating parental rights "would not be detrimental to the child[ren]"

---

[2] Mother failed to include any of her trial exhibits in the record on appeal, and therefore they form no part of our review.

and (2) the children had "a probability for adoption" but were "difficult to place for adoption" and there was "no identified or available prospective adoptive parent . . . ." (§ 366.26, subd. (c)(3).) Mother did not oppose the continuance; indeed, it afforded her more time to attempt to reunify with Y. and Daniel. Consequently, she did not appeal the court's order continuing the hearing for 180 days.

The county contends mother's failure to appeal the March 2006 order forecloses her present appeal from the .26 hearing held in October 2006. The county relies on the rule that because postdispositional dependency orders are generally appealable, a party in dependency proceedings may not challenge prior orders where the 60-day time limit for filing an appeal has passed. (*In re Cassandra B.* (2004) 125 Cal.App.4th 199, 208–209 [22 Cal.Rptr.3d 686]; see also *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150–1151 [65 Cal.Rptr.2d 913] [applying waiver rule to prevent collateral attack on unappealed earlier orders].) The unstated premise of the county's position is that the juvenile court determined back at the March 2006 hearing that Y. and Daniel were likely to be adopted, precluding a belated attack on that issue now.

The county's premise is faulty. Simply put, a finding that there exists, under section 366.26, subdivision (c)(3), "a probability" a child may be adopted is not the same as finding, under subdivision (c)(1), that it is "likely" adoption will occur. As we explained in *In re Jacob S.* (2002) 104 Cal.App.4th 1011 [128 Cal.Rptr.2d 654] (*Jacob S.*), by continuing the .26 hearing under section 366.26, subdivision (c)(3), the juvenile court in that case "*did not find that* [*the child*] *is likely to be adopted,* but only determined that adoption was [a] *probab*[*ility*] and that [the child] is difficult to place because of his disability." (*Jacob S.*, at p. 1019, italics added.) The same is true here: in concluding at the March 2006 hearing that there was "a probability" of adoption and continuing the matter 180 days, the juvenile court did not thereby conclude the children were "likely" to be adopted. Plainly, the juvenile court's identification of *obstacles* to adoption at the March hearing does not amount to a conclusion the children were likely to be adopted.

True, the distinction between "a probability" of adoption and the conclusion adoption is "likely" is subtle, but the ordinary meaning of these words differs, and the Legislature's use of different words in portions of section 366.26 that have different consequences persuades us the distinction is real.

Our Supreme Court has observed that the ordinary meaning of "likely" is " ' "more probable than not" ' " (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 918 [119 Cal.Rptr.2d 1, 44 P.3d 949].) In contrast, "a probability" generally does *not* mean " 'more likely than not, but merely a *reasonable*

*chance*, more than an *abstract possibility.*' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513], original italics; see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Of course, in loose parlance, "a probability" an event will take place may be understood to mean the event is "probable," and a synonym for "probable" is "likely." But the different outcomes prescribed in section 366.26, depending on whether adoption is "likely" or only "a probability," counsels against interpreting these terms synonymously.

We review issues of statutory construction de novo. (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 611 [10 Cal.Rptr.3d 486].) "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Under section 366.26, subdivision (c)(1), when the juvenile court concludes the child is "likely" to be adopted the court *must* terminate parental rights so the child can be placed for adoption and "get on with the task of growing up . . . ." (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1156 [94 Cal.Rptr.2d 693] (*Lukas B.*); see § 366.26, subd. (c)(1) ["If . . . it is likely the child will be adopted, the court *shall* terminate parental rights and order the child placed for adoption" (italics added)].) In contrast, under section 366.26, subdivision (c)(3), the court may continue the matter 180 days if there are obstacles making the child "difficult to place for adoption" and therefore there exists only "a probability" the child will be adopted. If the Legislature intended "a probability" of adoption to mean the same as "likely" to be adopted, the mandatory "shall terminate" language in subdivision (c)(1) would compel the court to terminate parental rights upon making the "probability" finding, thereby rendering subdivision (c)(3) and its 180-day provision empty legislation that could never be invoked. We decline to adopt an interpretation that nullifies the option of a 180-day continuance expressly provided for by the Legislature.

■ Moreover, we note the distinction the Legislature has made between adoption as "likely" versus "a probability" serves the best interests of dependent children. The low standard of "a probability" of adoption, which warrants a 180-day continuance, offers children who are "difficult to place" the opportunity to attain the permanency, stability, and other benefits of adoption, which is the Legislature's preferred permanent plan. (§ 366.26, subd. (b).) Although difficult to place initially, the child's odds for adoption may improve to "likely" by the end of the 180-period, especially if "an adoptive family has been found . . . ." (*Jacob S., supra*, 104 Cal.App.4th at p. 1019.)

■ Unfortunately, it may also happen that no prospective adoptive parent steps forward. Or, in the face of the factors that make the child difficult to place for adoption, or for innumerable other reasons unique to each family and child, a prospective adoptive parent who has shown interest in the child may have a change of heart. In these circumstances, it would make little sense to render the child a legal orphan by terminating parental rights. This undesirable result, however, would follow if the court's earlier finding of "a probability" of adoption were tantamount to finding it "likely" the child would be adopted, since section 366.26, subdivision (c)(1) *requires* termination of parental rights where adoption is likely. In light of the Legislature's use of different terms in subdivision (c)(1) and (3) of section 366.26, the different outcomes provided for in those provisions and the "best interests" of the child utilized throughout the dependency statutes, we conclude the Legislature did not intend "a probability for adoption" to be synonymous with a finding the child is "likely" to be adopted.

■ The doctrine of issue preclusion prevents relitigation of issues already argued and decided. (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 89 [38 Cal.Rptr.3d 528].) Among other requirements, the doctrine only applies where the identical issue was decided previously, and the party against whom the earlier decision is asserted had a " ' "full and fair" ' " opportunity to litigate the issue. (*Id.* at p. 90; see *Roos v. Red* (2005) 130 Cal.App.4th 870, 880 [30 Cal.Rptr.3d 446].) Because the issue considered at the March 2006 hearing of whether the children had "a probability" of adoption is different from the juvenile court's determination in October 2006 they were "likely" to be adopted, there is no reason to preclude mother from raising the latter issue because she did not appeal earlier. This is mother's first opportunity to challenge the juvenile court's conclusion the children were likely to be adopted. We therefore conclude she did not waive the issue by failing to appeal from the March 2006 order.

Our conclusion the dependency waiver rule does not apply here is consistent with *Jacob S., supra,* 104 Cal.App.4th 1011, *In re Cody C.* (2004) 121 Cal.App.4th 1297 [17 Cal.Rptr.3d 928] (*Cody C.*), and developments since those cases. In *Jacob S.* and *Cody C.,* we determined each parent prematurely appealed from the respective juvenile court orders continuing the .26 hearing 180 days. We reasoned that neither parent's attack had ripened to a justiciable issue because neither raised claims showing she was aggrieved by the court's order.

Two later decisions by other courts suggest that subsequent statutory changes undercut the rationale of *Jacob S.* and *Cody C.* (See *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1349–1351 [34 Cal.Rptr.3d 344] (*Ramone R.*); *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1438 [36 Cal.Rptr.3d 847] (*Gabriel G.*).) These decisions hold that a parent must appeal a juvenile court's order finding only "a probability" of adoption to preserve the option of long-term foster care for the child. (*Ibid.*)

██ *Ramone R.* and *Gabriel G.* interpreted changes to section 366.26, subdivision (c)(3), as removing the option of long-term foster care as a placement option *if and only if* the juvenile court continues the .26 hearing 180 days. We find this interpretation puzzling for it is plain in section 366.3 that long-term foster care remains the de facto placement for children who are not freed for adoption or placed with a guardian. (See § 366.3, subds. (d) & (g).) For these children, SSA and the juvenile court must continue efforts to obtain more permanent placement in the form of adoption or a guardianship. (*Ibid.*) But that does not mean the children cannot remain in foster care in the interim, or that placement there for months or years is any less "long term." In any event, whether a 180-day continuance order under section 366.26, subdivision (c)(3), is not appealable for lack of injury to the parent's interests (*Jacob S.; Cody C.*) or is reviewable as an integral part of a juvenile court order that may affect the child's interests (*Ramone R.; Gabriel G.*), the juvenile court's adoption "probability" finding has no preclusive effect on the subsequent issue of whether the child is "likely" to be adopted. That is the extent of our holding in the present case.[3]

---

[3] We are aware of dicta in *Gabriel G., supra,* 134 Cal.App.4th at page 1436 and in *In re Edward H.* (1996) 43 Cal.App.4th 584, 590 [50 Cal.Rptr.2d 745], suggesting a juvenile court's finding that termination of parental rights will not be detrimental to the child, which is a prerequisite to continuing the hearing 180 days (§ 366.26, subd. (c)(3)), *does* aggrieve the parent. Specifically, the finding forecloses the parent from raising any of the benefit exceptions to termination of parental rights (see § 366.26, subd. (c)(1)(A)–(F)) at the end of the 180-day period, absent a section 388 modification petition, because detriment is a threshold requirement for the exceptions. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2006) § 2.171(f)(f)(i) & (ii), pp. 2-343 to 2-344.) Neither parent in *Jacob S.* or *Cody C.* raised any of the benefit exceptions to termination of parental rights, nor does mother here. We therefore

Having rejected the county's waiver argument, we turn to the merits of mother's claim that no substantial evidence supports the juvenile court's conclusion in its October 2006 order that Y. and Daniel were likely to be adopted.

B. *Substantial Evidence Supports the Juvenile Court's Adoptability Finding*

■ Mother challenges the sufficiency of the evidence to support the juvenile court's conclusion Y. and Daniel were likely to be adopted. "To terminate parental rights and order adoption, the trial court must find by clear and convincing evidence 'it is likely the child will be adopted.' " (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523 [107 Cal.Rptr.2d 280] (*Jeremy S.*), disapproved on another ground in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541].) The juvenile court's inquiry at the .26 hearing focuses on whether the child's age, physical condition, or emotional state make it unlikely anyone will adopt the child within a reasonable time. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061 [27 Cal.Rptr.3d 612].) "[T]he fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650 [28 Cal.Rptr.2d 82] (*Sarah M.*).)

We review the juvenile court's adoptability determination for substantial evidence. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561–1562 [25 Cal.Rptr.3d 134].) Our circumscribed role on appeal and limited vantage point require that we draw all inferences and resolve any evidentiary conflicts in favor of the juvenile court's order. (See *id.* at p. 1562.)

Mother concedes her challenge to Daniel's adoptability stems only from his membership in a sibling set with Y. Mother's challenge based on Y.'s past behavioral problems fails to account for Y.'s marked and sustained improvement. The record discloses Y. exhibited no behavioral problems after she moved from SSA's sibling assessment facility to her second foster home in December 2005, save the understandable adjustment accompanying the children's transition to their prospective adoptive home. (See *Jeremy S., supra,* 89

express *no opinion on whether failure to appeal a subdivision (c)(3) continuance order would preclude the parent from later avoiding termination based on any of the benefit exceptions.*

Cal.App.4th at p. 524 [behavioral improvement supports adoptability finding].) Notably, moreover, Y.'s earlier problems generally occurred when father or mother or other destabilizing factors intruded into her life, and mother should not reap any benefit from her disruptive influence. (*Ibid.*; *Lukas B., supra,* 79 Cal.App.4th at p. 1154.)

■ Substantial evidence supports the juvenile court's conclusion Y. was adoptable. By the October .26 hearing, she had largely put her behavioral problems behind her, and she improved dramatically at school. No evidence showed her lingering academic deficits resulted from a diagnosed mental handicap that would make her difficult to place for adoption. (See § 366.26, subd. (c)(3). In addition to her behavioral and academic gains, Y. proved to be, according to the social worker's uncontested account, an open, playful, and attractive child who played appropriately and cooperatively with other children and also enjoyed the attention of adults—all attributes of an adoptable child. (See *Sarah M., supra,* 22 Cal.App.4th at p. 1651.) Additionally, Donald and Brenda's reaffirmed commitment to adopting Y. and Daniel constitutes substantial evidence they would likely adopt the children. Their example demonstrated any challenges the children presented were not likely to dissuade others from adopting them. (*Id.* at pp. 1649–1650.) Consequently, mother's challenge to the court's adoptability finding is therefore without merit.

Mother contends that in reaching its conclusion the children were likely to be adopted, the juvenile court was unduly swayed by its earlier "probability" of adoption finding at the March 2006 hearing. Mother concedes, however, the court entered the requisite findings at the October hearing that the children were likely to be adopted, and our review of juvenile court proceedings, like any trial matter, extends to results, not reasons. (See *People v. Gibson* (1987) 195 Cal.App.3d 841, 853 [241 Cal.Rptr. 126]; see generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, p. 382.) As discussed, substantial evidence supports the juvenile court's conclusion Y. and Daniel were likely to be adopted.

C. *Evaluation of Placement with Maternal Aunt**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 99.

## III

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

O'Leary, Acting P. J., and Fybel, J., concurred.