Filed 2/28/14  In re W.W. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re W.W. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E059183 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ110910) |
| v. | OPINION |
| J.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Karen J. Todd, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

1

Defendant and appellant J.M. (Mother) appeals the termination of her parental rights under Welfare and Institutions Code section 366.26[1] as to her two minor sons, W.W. and L.W. (collectively, "Minors"). Mother contends the juvenile court erred when it found the sibling relationship exception in section 366.26, subdivision (c)(1)(B)(v) did not apply, because Minors have a significant bond with their four sisters. Mother believes the termination of her parental rights would cause a substantial interference with Minors' sibling relationships. Because Minors' prospective adoptive parents have agreed to maintain contact between Minors and their siblings, we find the court properly balanced the children's interests in maintaining those ties and their need for a permanent and stable home through adoption.

## FACTUAL AND PROCEDURAL HISTORY

### A. PARENTAL RIGHTS

W.W. is the eldest of Mother's children; he was born in May 2002. His half-sister, S.N., was born in August 2005.[2] Mother tested positive for methamphetamine and marijuana at S.N.'s birth. On October 21, 2005, a juvenile dependency petition was filed to protect the children under section 300, subdivision (b), because Mother and both fathers were abusing drugs and neglecting the children. The allegations were found true at a hearing on December 14, 2005; Mother retained custody of the children subject to

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] W.W.'s father is W.W.Sr., SN's father is J.N.; neither father is a party to this appeal.

the supervision of a social worker. Family maintenance services were provided until the case was dismissed on June 21, 2007. L.W. was born in September 2007.[3]

A new juvenile dependency petition was filed on May 8, 2008, after a social worker visited Mother's home. She found it unsafe and filthy, noting, "methamphetamine and paraphernalia [were] accessible to the children, and adults with criminal history [were] in the home." One of the men present in the home "was a parolee at large and considered armed and dangerous"; he had been charged with domestic violence and child endangerment. The children were placed together in a foster home.

At a jurisdictional hearing on July 15, 2008, the children were removed from Mother's custody; and she was offered reunification services. Mother was referred to drug testing and parenting, anger management, and substance abuse classes on June 6, 2008. Mother missed a number of drug tests and, as of July 6, 2009, had not completed the prescribed services. Mother's services were twice extended. Mother began to make satisfactory progress, and on November 6, 2009, the children were restored to her care under family maintenance. Family maintenance services were renewed at the 18-month review hearing on January 11, 2010.

A fourth child, M.K., was born in March 2010. A social worker visited Mother's home because there was an open dependency matter, and found the home was in

---

[3] L.W.'s father is also W.W.Sr.

"disarray" and the newborn was residing with the alleged father, D.K.[4] A paternity test revealed D.K. was not M.K.'s father and on April 2, 2010, the court ordered D.K. to return M.K. to Mother. After a second home visit and Mother's clean drug test result, M.K. was allowed to remain in Mother's care. A dependency petition was filed on behalf of M.K. on April 6, 2010.

On June 25, 2010, plaintiff and respondent Riverside County Department of Public Social Services (Department) recommended the dependency of the children be terminated and Mother given sole legal and physical custody.

An amended report filed by the Department on August 18, 2010, recommended the dependency be continued and that an additional six months of family maintenance services be provided. On July 29, an immediate response referral for general neglect was received by the Department. The referral indicated the children were filthy, with sores on their bodies, and the newborn appeared malnourished. Upon visitation, the children were found in adequate condition, but Mother was sleeping in a van and leaving her children with relatives. Mother was having problems with D.K. and felt it was not safe for the children to be around him. The dependency was continued and further services ordered at the review hearing on August 23, 2010.

Mother was expelled from a sober living home in December 2010 for testing positive for an illegal substance. On January 19, 2011, mother moved into a domestic violence shelter. A subsequent juvenile dependency petition was filed on March 18,

---

[4] D.K. was Mother's drug rehabilitation counselor and was later found by the court to be M.K.'s presumed father. He is not a party to this appeal.

4

2011, when it was reported Mother had relapsed into methamphetamine use. She had stopped sending W.W. and S.N. to school. Mother was spending her welfare funds on drugs, and had to appeal to D.K.'s mother, C.K. (Grandmother), for support for the children. The Department filed a detention report recommending the children be detained from their parents, which was adopted by the juvenile court on March 21, 2011. The children were placed together in a confidential foster home.

In interviews with the Department, Mother revealed she was pregnant with twins ("the twins"). She had moved into a sober living home after the filing of the dependency petition. She hoped the children could be placed with Grandmother. A restraining order was issued against D.K. on February 22, 2011, keeping him from contact with Mother and the children because of concerns about potential violence.

W.W., L.W., S.N., and M.K. were declared a sibling group and removed from Mother's care by the juvenile court's order dated April 19, 2011. The court found, "[d]eveloping or maintaining the sibling relationship with the siblings is appropriate." Mother was offered family reunification services. At this time, the children began to display negative behaviors. In an October 11, 2011, report, the social worker noted W.W. was failing third grade; S.N. appeared "emotionally unstable" following visits with Mother and J.N.; and that L.W. had experienced adjustment issues. Mother had been required to complete psychiatric evaluation, general counseling, parenting

education, outpatient substance abuse treatment and testing,[5] and a 12-step program, but was not in compliance with that program. She was a no-show for her two most recent scheduled drug tests. It was the opinion of the social worker the children's misbehavior was a result of the uncertainty of being returned to their parents.

Mother's reunification services were terminated on October 28, 2011, because of her failure to participate and make substantive progress in her treatment plan.

### B.    THE SIBLING GROUP

S.N. misbehaved in her foster home, which was believed to be tied to her feelings of abandonment by her father. The assigned social worker approached Grandmother about taking the siblings. She declined, as she was caretaking the twins and seeking to adopt M.K. but did not feel she could handle six children. Accordingly, "to reduce failed placements and reduce the amount of time to provide permanency for the children," the social worker recommended the sibling set finding be set aside to enable adoption of the children.

The Department proposed a plan at the combined section 366.26/366.3 hearing that Minors would be placed with their father's estranged wife; S.N. would be placed with her maternal grandfather; and M.K. would be placed with Grandmother. All caregivers agreed to provide ongoing contact between the siblings. The separate placements required setting aside the sibling set designation. Otherwise, long term foster care was likely, given the size of the group and S.N.'s behavioral issues. On

---

[5] D.K. was ordered to undergo drug testing in connection with his parental rights over the twins. He tested positive for methamphetamine on June 24, 2011.

February 27, 2012, the juvenile court granted the request to sever S.N. from the sibling group.

M.K. had been placed with Grandmother, who planned to adopt her. W.W., L.W., and S.N. were together in a foster home. The other planned placements were stymied by an inability to clear them with the Relative Assessment Unit. During this time, W.W.'s grades "improved tremendously" and S.N.'s and L.W.'s behavioral issues ceased. S.N. was placed in a prospective adoptive home on October 12, 2012.

Mother's parental rights were terminated following section 366.26 hearings as to M.K. on October 24, 2012, and as to S.N. on December 19, 2012. Minors were placed together in a prospective adoptive home on December 13, 2012. As part of her report to the court, the social worker noted W.W. had called to tell her that he and S.N. were worried S.N.'s maternal grandfather would adopt her and take her away, and that the grandfather would also try to adopt him and L.W. W.W. said he and L.W. did not want to be taken away from their adoptive "'forever family.'" The boys were doing well in the adoptive placement.

Problems arose with the boys' placement. On April 9, 2013, an emergency ex parte application was filed by Minors' counsel to block the Department's seven-day notice to remove the boys from their adoptive placement. The juvenile court directed that the children should be maintained in their placement by order dated April 12, 2013. An addendum report was filed by the Department on that date reporting the removal was requested because of ongoing sibling visitation issues. The prospective adoptive parents told the social workers that after adoption they would only allow contact with

M.K. and the twins over Skype service, and the prospective adoptive mother was overheard expressing vitriolic hatred for Grandmother. They initially refused to meet Grandmother and did not want her to know what they looked like. They were willing to allow contact with S.N., because she was with non-related adoptive parents who were "'like us,'" but would not meet Grandmother because she was a biological grandparent. The social worker found their information about Grandmother was not first-hand and their validations for not meeting her were irrational. Minors' prospective adoptive parents and Grandmother were ordered to attend counseling.

Minors wanted to continue to see M.K. and the twins, and considered them family. W.W. said it was "'important'" for the siblings to see each other "'even if they live in different houses.'" The petitioning social worker felt the prospective adoptive parents did not understand that Minors would suffer trauma if their contact with M.K. and the twins was cut off. The prospective adoptive parents would only agree to two yearly supervised visits at the Department's office. They were concerned because Grandmother still had contact with Mother and the children's fathers, from whom the children had been taken. They did not oppose having sibling relationships, but did not want Minors to be in the presence of people who had been found to be a danger to them. In addition, they "had only heard negative things" about Grandmother from a social worker and her supervisor.[6] For her part, Grandmother was demanding to take custody

---

[6] A prior meeting had been set to allow the three adoptive parental units to meet, but Grandmother refused to participate because it would not be "worth it." She stated a

*[footnote continued on next page]*

of Minors for the weekend every other week, which the counselor explained to her was appropriate for a divorce, but not in an adoption.

Following the court-ordered counseling, the prospective adoptive parents and Grandmother reached an accord. They agreed sibling visitation was in the best interests of the children, and scheduled "several" yearly meetings to maintain sibling relations. The social worker reported on a meeting held on May 9, 2013: W.W. was "very nurturing" toward the younger girls, the children played together, and the caregivers were "amicable and exchanged photographs." The siblings would all be residing within the same county.

As a result, the Department recommended Minors be kept in their adoptive placement and that Mother's parental rights to them should be terminated. After taking testimony from mother and maternal grandparents, the juvenile court adopted the Department report and findings, and terminated Mother's parental rights. The juvenile court found the sibling exception did not apply.

## DISCUSSION

Mother contends substantial evidence does not support the juvenile court's finding that the sibling relationship exception did not apply. We disagree.

If a child cannot be returned to a parent, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th

---

*[footnote continued from previous page]*
social worker had told her negative things about the other adoptive parents and that Minors' affection had been "bought" by the prospective adoptive parents.

567, 573.) In general, if the juvenile court finds at a section 366.26 hearing the child is adoptable, it must terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).) This rule is subject to a number of statutory exceptions (§ 366.26, subd.(c)(1)(A), (c)(1)(B)(i)-(c)(1)(B)(vi)), including the sibling exception, which applies when termination would cause a substantial interference with the sibling relationship. The party challenging the termination of parental rights bears the burden to produce evidence showing an exception applies. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) A parent has standing at a section 366.26 hearing to argue that the sibling exception applies. (*In re Jacob S*. (2002) 104 Cal.App.4th 1011, 1016.) "In enacting this exception, the Legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) "[T]he sibling relationship exception permits the trial court to consider possible detriment to the child being considered for adoption, but not a sibling of that child." (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) "[T]he application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A*. (2007) 152 Cal.App.4th 987, 1014.)

To determine whether the exception applies, "[t]he court must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951) The juvenile court undertakes a two-step

10

analysis in evaluating the applicability of the sibling relationship exception pursuant to section 366.26, subdivision (c)(1)(B)(v). First, the court is directed to consider: (1) "whether the child was raised with a sibling in the same home"; (2) "whether the child shared significant common experiences or has existing close and strong bonds with a sibling"; and (3) "whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*L.Y.L.*, at p. 951.) "If the court determines terminating parental rights would substantially interfere with the sibling relationship, the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Id.*, at pp. 951-952.) "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822.)

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citations.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 61.)

We review the juvenile court's sibling exception determination for substantial evidence. In applying this standard, "we draw all reasonable inferences in support of the findings, view the record [in the light] most favorabl[e] to the juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion. [Citation.]" (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) The juvenile court's finding the sibling exception to adoption did not apply must be upheld if, viewing the evidence in the light most favorable to the court's ruling, substantial evidence supports that ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) A challenge to the juvenile court's determination of whether, given the existence of a sibling relationship, there is a compelling reason for determining termination of parental rights would be detrimental to the child "is a quintessentially discretionary determination" calling for a high degree of appellate court deference. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

In our view, substantial evidence supports the juvenile court's finding the benefits of the sibling relationship do not outweigh the benefits of adoption. Mother asserts only restoration of her parental rights can ensure Minors maintain their sibling bonds, and rejects the possibility of adoption. Initially, her argument fails because it provides no remedy. Mother lost her parental rights to S.N., M.K., and the twins. If Minors were removed from their adoptive family, they would still be separated from their sisters. The juvenile court previously severed S.N. from the sibling set, and the twins were never part of that set. There will be no restoration of the status quo *ante*. Given that Mother's proposed remedy does not solve the problem it is meant to address,

12

it cannot outweigh the benefit to Minors from adoption into a loving and permanent home.

Second, Mother's argument fares little better if it is construed as an argument against placing Minors with the prospective adoptive parents and urging us only to restore them to her nominative parenting until a new home can be found. There is evidence in the record the prospective adoptive parents were originally unwilling to maintain contact with M.K.[7] They were worried because they had heard bad things about Grandmother from an assigned social worker, as had Grandmother about them. More significant was the fact that Grandmother was the mother of D.K., the father of some of Mother's children. The record is replete with references to D.K.'s drug use and temper, and he was subject to a restraining order keeping him from Mother and the four older children. It is not unusual that the prospective adoptive parents would be reluctant to have their children visit at Grandmother's house, given the possibility D.K. might be around.[8] Additionally, it is understandable the prospective adoptive parents would have difficulty reaching agreement on terms of visitation with M.K. if Grandmother's seemingly non-negotiable demand was for "Friday through Sunday" visits for Minors every other week. The prospective adoptive parents were not unreasonable in resisting Grandmother's proposal for sibling visits; they proposed alternate schedules that the

---

[7] As noted, the prospective adoptive parents had no problem with maintaining sibling contact with S.N.; the twins, because of their age, were not part of the sibling set.

[8] Grandmother was vocal with the Department in her view that D.K.'s parental rights were taken away unfairly.

counselor accepted as appropriate, and succeeded in putting aside their prejudices and attending amicable sibling visits. The selection of the prospective adoptive parents as adoptive parents does not impair the likelihood of maintaining the sibling bond.

Lastly, the sibling bond is not of such a high degree to require the siblings be kept as a unit. As noted by the assigned social worker, the size of the group and S.N.'s then-ongoing behavioral issues made it likely the children were destined for a long-term foster home placement, not adoption. Given the social preference for adoption, it would take a strong sibling benefit to deny Minors an adoptive home. The connection between Minors and M.K. is tenuous. M.K. was born in 2010 and placed with Grandmother in 2012. She was not raised with Minors and is not likely to have significant shared experiences with them because of her young age. Although Minors consider her part of the family and take pleasure in her company, it is not likely they look to her as someone who has shared years of family turmoil with them or as a substitute parent. The interest of Minors will be best served through adoption even though it will require maintaining the sibling relationship over some small distance.

The juvenile court directly confronted and decided the question of whether the prospective adoptive parents were improper adoptive parents because they appeared to be insufficiently attentive to Minors' sibling bonds. The juvenile court decided in favor of the adoption and the permanency and stability it will bring to Minors' lives. It determined that the prospective adoptive parents intended and were committed to sustaining Minors' sibling relationships. Review of the record discloses substantial evidence in support of the court's ruling.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

                       J.

We concur:

HOLLENHORST

         Acting P. J.

McKINSTER

         J.