Filed 6/30/14  In re M.T. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re M.T., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B249802 (Super. Ct. No. J1396145) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD PROTECTIVE SERVICES, Plaintiff and Respondent, v. N.M., Defendant and Appellant. | |

N.M. (mother) appeals the juvenile court's ordering terminating her parental rights to her minor daughter M.T. and selecting a permanent plan of adoption.  (Welf. & Inst. Code,[1] § 366.26.)  Mother contends the court applied the wrong legal standard in determining that the beneficial parental relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply, and that the evidence is insufficient to support that finding.  Mother also challenges the sufficiency of the evidence supporting the court's finding that the sibling relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(v)) did not apply.  We affirm.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

FACTS AND PROCEDURAL HISTORY

Mother has given birth to five children. Her fourth child, M.T., was born in September 2008. Mother's youngest child, M.T.'s half-sister S.T., was born in December 2009. In a November 2012 detention report, Santa Barbara County Child Protective Services (CPS) stated that mother had been arrested after M.T. and S.T. were found with mother and three other adults in a motel room that reeked of marijuana. The police also found syringes, a bong, and a small amount of marijuana that mother admitted was hers. Mother admitted she had a history of relapsing on methamphetamine and had recently relapsed on the drug. Both children witnessed the police use a Taser on one of mother's adult companions, who was a parolee at large. The children were detained and placed together in a foster care home in Santa Barbara. Mother was allowed supervised visits.

The petition also alleged that mother's parental rights to M.T. and S.T.'s older half-siblings C.T. and E.R. had been terminated in 2007 as a result of mother's drug use. M.T. and S.T.'s other half-sibling, N.R., was detained in September 2007 and was living with her paternal grandmother. M.T. had been the subject of three prior referrals due to the drug use of mother and M.T.'s father and their incidents of domestic violence.[2] Mother also engaged in domestic violence with S.T.'s father, often in the presence of both children. Mother's extensive criminal history included charges for domestic violence and being under the influence of a controlled substance.

In its jurisdiction and disposition report, CPS recommended that reunification services as to mother be bypassed pursuant to section 361.5, subdivisions (b)(1)), (b)(11), and (b)(13). As to M.T., CPS further recommended that the matter be set for a section 366.26 permanency planning hearing. CPS recommended that S.T.'s father be offered reunification services.

At the contested jurisdiction and disposition hearing, the court granted reunification services as to S.T.'s father and denied his request to be declared M.T.'s presumed father. The court denied services as to M.T.'s father, set a section 366.26

_____

[2] M.T.'s father is not a party to this appeal.

hearing for M.T., and set a six-month review hearing for S.T. The court subsequently denied mother's petition seeking modification of the order denying her reunification services and increased visitation.

In its May 2013 section 366.26 report, CPS recommended that mother's parental rights to M.T. be terminated and that adoption be selected as the child's permanent plan. CPS reported that M.T. had been living with her prospective adoptive parents since January 2013 and was very happy in the placement. The social worker characterized the placement as "excellent" and reported that M.T. loved the prospective adoptive parents and wanted to continue living with them. The social worker was also confident that a suitable alternative adoptive placement could be located if necessary.

Although four-year-old M.T. and two-year-old S.T. were living in the same foster home, S.T. appeared to be on a successful plan of reunification with her father. S.T. and her father always attended mother's twice-monthly supervised visits with M.T. During those visits, the children spent most of their time with S.T.'s father and were more affectionate towards him. Both children were eager to leave at the end of the visits, however, and the visits ended without incident.

The social worker concluded that M.T. and S.T. were bonded because they had lived together since S.T.'s birth. The prospective adoptive parents expressed an interest in maintaining contact between the girls. After mother and S.T.'s father made several unsubstantiated allegations that the prospective adoptive mother had abused or neglected the girls, the prospective adoptive parents remained open to continued contact so long as the visits were supervised.

At a trial confirmation conference, mother asserted that the beneficial parental relationship and sibling relationship exceptions precluded the termination of her parental rights. CPS requested that mother's visits with M.T. be suspended due to the fact she had made three more unfounded claims against the prospective adoptive mother. The court granted the request and set the matter for a contested section 366.26 hearing.

Six days before the contested section 366.26 hearing, S.T.'s father filed a statement of parentage reiterating his request that he be declared M.T.'s presumed father.

3

At the outset of the hearing, M.T.'s father orally moved to set aside the finding that he was M.T.'s presumed father and instead make that finding as to S.T.'s father. The court denied the motion as untimely.

Mother called M.T. to testify. M.T. stated that her family included mother, her maternal grandmother, her dog Blaze, and her Uncle Nathan. On further questioning, she added that she had three sisters, including her youngest sister S.T. M.T. also said she wished she saw mother more often. When asked if she missed seeing mother, she replied, "Not all the time, but sometimes." M.T. replied "[y]eah" when asked if she did "everything" with S.T. She replied "no" when asked if she "miss[ed]" S.T. when she was "not close to her," then agreed with the assessment that she had "never been away from" S.T.

The maternal grandfather testified that M.T. and S.T would be "devastate[d]" if they were separated. S.T.'s father "couldn't see how [M.T. and S.T] would react if they were split apart," but thought "it would be pretty traumatic for them." The social worker acknowledged that the girls were emotionally bonded and agreed when asked whether S.T.'s removal from the prospective adoptive parents' home "would be detrimental to [M.T.] at the time that that removal occurred[.]" The social worker concluded, however, that M.T. would not be "traumatized" by the experience. Although the social worker believed that M.T. would "feel loss" and "grieve," the social worker was also "prepared to help her to deal with that" through counseling.

The social worker further testified that although M.T. ran up and hugged mother at the beginning of their visits, when the visits ended she "cheerfully" skipped to the prospective adoptive mother, hugged her, and left without incident. When the social worker visited M.T. in her placement, the child was "always very happy and cheerful, silly, playful," "well-adjusted" and "talkative." A case aide testified that M.T. and S.T. enjoyed their visits with mother and that mother was always prepared with activities for the girls.

4

Mother testified that M.T. always greeted her with a hug and kiss and called her "momma." Mother characterized M.T. and S.T. as "best friends" and said she appropriately parented the girls during her visits.

At the conclusion of the hearing, the court found that mother had failed to meet her burden of proving the termination of her parental rights was precluded under either the beneficial parental relationship or sibling relationship exceptions. With regard to the former exception, the court found "it is not even a close case. The mother has not progressed beyond supervised visitation, really has been nothing presented more than she knows that as [M.T.] knows that the mother is her mother and has a relationship that is not enough, that is not near enough to go ahead and defeat the adoption preference that exists under the law . . . ."

After noting that mother bore a "heavy burden" in seeking to prove the sibling relationship applied and thus precluded M.T.'s adoption, the court reasoned "[t]here is no doubt that if [M.T. and S.T.] are separated there will be some impact on [M.T.] because she has been with her sister. . . . [¶] There has been evidence that they know each other as siblings, but that is not enough. I don't have any psychological evidence that [M.T.] is going to be damaged by the severance of that relationship versus the benefit [the] law says exists by adoption, nothing. I need a compelling reason to overcome the benefits of adoption, it simply is not there. Adoption is supposed to be the norm. It is legally found to be the norm, so I just don't have enough to go on here to go ahead and overcome the presumption in favor of adoption so I find that the burden has not been carried." The court proceeded to terminate mother's parental rights, found M.T. to be adoptable, and selected adoption as her permanent plan.

DISCUSSION

*Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred in finding the beneficial parental relationship exception to adoption did not apply, and consequently erred in terminating her parental rights to M.T. We conclude otherwise.

Section 366.26, subdivision (c)(1)(B) requires the juvenile court to terminate parental rights if it finds by clear and convincing evidence that a child is likely to be adopted, unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" due to an enumerated statutory exception. The beneficial parental relationship exception of section 366.26, subdivision (c)(1)(B)(i) requires a showing of "regular visitation and contact with the child and the child would benefit from continuing the relationship." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "To meet the burden of proof, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits." (*Ibid.*) The parent must establish the existence of a relationship that promotes the child's well-being to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 936.) Only in an "extraordinary case" can a parent establish the exception because the permanent plan hearing occurs after the court has repeatedly found the parent unable to meet the child's needs. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Mother argues the court misapplied the law in finding the beneficial parental relationship exception did not apply. She claims the court's reference to the fact that mother "'had not progressed beyond supervised visits'" demonstrates an erroneous belief that the exception cannot be established by a parent who has not "advance[d] beyond supervised visits."

The court did not misstate or misapply the law. The beneficial parental relationship exception requires proof of a "'. . . significant attachment from child to parent [that] results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day

6

interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.'" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D.*), quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The exception will be difficult to establish where, as here, the parent has not "advanced beyond supervised visitation." (*Casey D.*, at p. 51.) The court thus properly considered this fact in concluding the exception did not apply.

Mother cites *In re S.B.* (2008) 164 Cal.App.4th 289, 299, for the proposition that the beneficial parental relationship exception does not require the parent to prove "the child has a 'primary attachment' to the parent" or that "the parent and the child have maintained day-to-day contact." This conclusion does not, however, undermine *Autumn H.*'s holding that the beneficial parental relationship exception contemplates the type and quality of relationship that "arises from day-to-day interaction, companionship and shared experiences." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) As the court in *Casey D.* explained, "the *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact. . . . Another way of stating the beneficial parent-child concept described in *Autumn H.* is: a relationship characteristically arising from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Casey D., supra*, 70 Cal.App.4th at p. 51.) Substantial evidence supports the juvenile court's finding that this is not such a case.

We also reject mother's claim that the evidence is insufficient to support the court's finding that the beneficial parental relationship exception did not apply. Historically, courts have applied the substantial evidence standard of review to such determinations. (*Autumn H., supra*, 27 Cal.App.4th at pp. 575–576.) More recently, some courts have applied this standard to the juvenile court's determination whether a

7

beneficial relationship exists, and the abuse of discretion standard to the determination whether the relationship is important enough to preclude adoption. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.) Under either standard, we can reverse only """if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citations.]' [Citation.]" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

No such finding can be made here. As we have noted, mother never advanced beyond supervised visitation with M.T. Indeed, the visits were terminated as a result of mother's repeated unfounded allegations against the prospective adoptive mother. The record is also replete with evidence that mother did not occupy a true parental role in M.T.'s life. Moreover, M.T. suffered no distress at the end of mother's visits and said she loved the prospective adoptive parents and wanted to continue living with them. In light of this evidence, the court could reasonably find that mother had failed to meet her burden of proving the beneficial parental relationship to adoption applied. Mother's arguments to the contrary either disregard the standard of review or rely on cases that are factually inapposite.[3]

*Sibling Relationship Exception*

Mother alternatively contends the court erred in finding that the sibling relationship exception to adoption did not apply. As we have noted, we can only reverse such determinations """if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." . . .'" (*In re Robert L., supra*, 21 Cal.App.4th at p. 1067.) We can make no such finding here.

---

[3] In her reply brief, mother complains that CPS's brief "compare[s] mother's relationship with M.T. to the [prospective adoptive] mother's relationship with M.T." and offers that "[m]other is not required to prove she had a stronger relationship with M.T." CPS does not argue, however, that mother had to make such a showing. Instead, CPS correctly recognizes that M.T.'s relationship with her prospective adoptive parents is relevant to the determination whether mother's relationship with M.T. was strong enough to outweigh the benefit she would gain if adopted. (*In re Jason J., supra*, 175 Cal.App.4th at p. 936.)

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to the statutory preference for adoption where "the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. . . .'" (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) "Furthermore, the language focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings." (*Daniel H.*, at p. 813.)

"[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R., supra*, 31 Cal.4th at p. 61.) In doing so, the juvenile court is directed to consider "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The court did not err in finding that mother had failed to meet her burden of proving M.T.'s adoption was precluded under the sibling relationship exception. In arguing otherwise, mother once again ignores the controlling standard of review, which compels us to view the evidence in the light most favorable to the court's ruling. She also alludes to S.T.'s interests in maintaining the sibling relationship, interests that are irrelevant to the issue at hand. Moreover, mother makes no mention of the evidence reflecting the long-term and lasting benefits M.T. will derive from adoption.

In attempting to demonstrate M.T. will suffer irreparable harm if her relationship with S.T. is severed, mother asserts the social worker merely "speculated" that the feelings of loss M.T. will suffer as a result of her separation from S.T. could be

9

addressed through therapy. This assertion misses the point. The social worker acknowledged that M.T. would grieve and suffer a sense of loss, and stated she was "prepared to help [M.T.] to deal with that." Of course, the social worker cannot predict with certainty neither the extent to which M.T. will grieve nor the benefit she will ultimately derive from therapy. The social worker ultimately concluded, however, that any detriment M.T. will suffer as a result of the loss would be outweighed by the benefits she will derive from adoption. M.T.'s attorney, who was appointed to represent the child's best interests, agreed with this assessment and joined in the recommendation that mother's parental rights be terminated, that M.T. be found adoptable, and that adoption be selected as her permanent plan. Given these recommendations, and ample evidence of the long-term physical and emotional benefits M.T. will achieve through adoption, the court did not err in concluding that mother had failed to meet her "heavy burden" of proving the sibling relationship exception to adoption applied. (*In re Celine R., supra,* 31 Cal.4th at p. 61.)[4]

The judgment (order terminating parental rights) is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

_____

[4] Mother takes issue with the court's reference to the lack of "any psychological evidence that [M.T.] is going to be damaged by the severance of [the sibling] relationship versus the benefit [the] law says exists by adoption[.]" She asserts that "[n]o where in the statute is there a requirement that in order for the exception to apply, the parent must provide the court with 'psychological evidence.'" She then complains that she "had no opportunity to have a psychologist conduct an evaluation of the children." The latter complaint is unfounded. Mother could have asked the court to order an evaluation. Moreover, the lack of such an evaluation was relevant to the court's determination. (*In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018 ["In a case where the strength of a bond between very young siblings is difficult to determine because of the young age of the children involved, court-ordered sibling bond studies may be appropriate. Such studies would be helpful-in some cases might even be indispensable-in determining the applicability of section 366.26, subdivision (c)(1)(E)"], disapproved on another point in *In re S.B., supra*, 46 Cal.4th at p. 531, fn. 5.)

10

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____


Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dennis A. Marshall, County Counsel, Bo L. Bae, Deputy County Counsel, for Plaintiff and Respondent.