Filed 8/29/22 In re S.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.D. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CASSIDY S. et al.,<br><br>    Defendants and Appellants. | F083933<br><br>(Super. Ct. Nos. 20CEJ300303-1, 20CEJ300303-2)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County. Todd Eilers, Judge.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Cassidy S.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant Raymond D.

Daniel C. Cederborg, County Counsel, and Carlie M. Flaugher, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING OPINION**

Cassidy S. (mother) and Raymond D. (father) appeal from the juvenile court's orders after the Welfare and Institutions Code section 366.26[1] hearing terminating their parental rights to their two children, S.D. and Greyson D. Mother and father, joining in each other's arguments, argue the juvenile court erred when it found Greyson adoptable; when it failed to find the sibling exception to adoption applied to termination of their parental rights; and that the case must be remanded for a bonding study to assess the sibling bond between the two children. Mother and father also argue that the Fresno County Department of Social Services (department) failed to adequately address the issue of whether the children were Indian children under the Indian Child Welfare Act (ICWA). We find only ICWA error and remand for a limited purpose to address that issue.

## STATEMENT OF THE FACTS AND PROCEDURE

*Referral*

On October 1, 2020, a referral was generated to the department after mother placed four-year-old S.D. and two-year-old Greyson with maternal grandfather, who was no longer able to provide care for the children due to his medical conditions. The whereabouts of mother was unknown. Mother had a history of substance abuse and mental illness. Mother later informed the department that father was the biological father of S.D., but that Greyson was the result of a rape by an unknown male.

The department filed a section 300 petition October 5, 2020, alleging S.D. and Greyson were at risk of harm due to mother's substance abuse problem and her inability to care for and protect the children. The petition further alleged that father failed to adequately supervise and protect S.D. due to his own unstable lifestyle and to protect her from mother.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

*Detention*

Mother was not present at the detention hearing held October 6, 2020. The juvenile court detained both children and granted mother and father supervised visitation. Father, who was present, stated orally that he may have Indian ancestry with the Choctaw or Blackfoot tribes. The juvenile court ordered the department to send notice to any applicable tribe or tribes and the Bureau of Indian Affairs (BIA). A jurisdiction and disposition hearing was set for November 3, 2020.

*Jurisdiction/Disposition*

In its report dated November 3, 2020, the department recommended that mother receive family reunification services and that father receive services for S.D. only. Father was considered the presumed father of S.D. and remained the alleged father of Greyson. The children were placed together in foster care.

In an ICWA update, the department wrote that mother had not been cooperative with the department during interviews and had refused to answer questions. Father had not made himself available to the department since the detention hearing to follow-up regarding his possible Native American ancestry.

On November 5, 2020, ICWA notice was sent to the Blackfeet Tribe of Montana, the Choctaw Nation of Oklahoma, the Jena Band of Choctaw Indians, and the Mississippi Band of Choctaw, as well as the BIA. Responses from the Choctaw Nation of Oklahoma and the Mississippi Band of Choctaw were filed November 30, 2020, indicating that the children were not eligible for enrollment in those tribes.

Neither mother nor father was present at the jurisdiction/disposition hearing December 1, 2020. The juvenile court found the allegations in the petition true and a continuance was granted for disposition due to ICWA notice.

Both mother and father were present at the disposition hearing January 12, 2021. The children were declared dependents of the court and removed from mother's custody; S.D. was removed from father's custody. Mother was granted reunification services as to

3.

both children; father was granted services as to S.D.  The ICWA was found not to apply. A six-month review hearing was scheduled for July 6, 2021.

*Six-Month Review*

The report written in anticipation of the July 6, 2021, six-month hearing recommended reunification services be terminated and a section 366.26 hearing be set. S.D. was placed in a relative home, while Greyson was placed in foster care.

Mother and father had been inconsistent in maintaining contact with the department and the children.  Mother was dropped from visitation after three consecutive no shows at the beginning of June 2021.  The department filed a declaration of due diligence for father on June 28, 2021.

Mother attended her domestic violence inventory assessment in March of 2021 and was recommended for the child abuse intervention program and batterer's treatment program.  But she was dropped from parenting classes due to no shows, did not attend her assessment for substance use disorders, did not enroll in random drug testing, and did not attend her mental health assessment, despite the department's efforts to reconnect her to services.

Father had been referred for all ordered services twice during the review period, but the referrals were closed due to lack of contact by father.

Mother was not present at the July 6, 2021, six-month review hearing.  Father, who was present, asked that the matter be set for a contested hearing, which was scheduled for July 15, 2021.

At the July 15, 2021, contested hearing, only father was present.  The juvenile court terminated services as to both mother and father and a section 366.26 hearing was set for October 28, 2021.

*Section 388 Petition*

On October 20, 2021, father filed a section 388 petition requesting the section 366.26 hearing be vacated and he be granted family reunification services.

4.

*Section 366.26 Hearing*

The report prepared in anticipation of the section 366.26 hearing recommended adoption as the permanent plan for both children. S.D. remained in relative care and Greyson was recently placed in a new foster home on October 1, 2021. The report stated that both children were developing in an age appropriate manner and doing well. Both were reported to be generally adoptable.

The report noted that Greyson's third placement had been stable, but ended after 10 months because the caregiver needed to move out of state. The fourth placement for Greyson was considering adoption. S.D.'s caregivers indicated a willingness to facilitate contact between the siblings after adoption.

The report indicated that the juvenile court had found the ICWA inapplicable on January 12, 2021, but also that mother had reported on October 1, 2021, that she was not sure if she had Native American ancestry.

Both mother and father were present via Zoom at the scheduled section 366.26 hearing October 28, 2021. The juvenile court denied father's section 388 petition.

The matter was set for a settlement conference hearing January 20, 2022, and contested hearing February 3, 2022, as the parents were claiming a beneficial relationship exception, a sibling bond, that could preclude adoption.

*Request to Elevate Paternity Status for Father*

On November 19, 2021, father requested the juvenile court calendar his request to elevate his paternity status to presumed father of Greyson.

*Father's Second Section 388 Request*

Father filed a second section 388 petition requesting again that the section 366.26 hearing be vacated and reunification services for father resume.

At the January 20, 2022, hearing, the juvenile court granted father's request to elevate his paternity status to presumed father of Greyson. Father's section 388 petition was denied.

*Contested Section 366.26 Hearing*

The department filed an addendum report dated February 3, 2022, in which it was noted that Greyson's adoptive placement had given notice and he would need to move from the placement. The caregiver family felt that they could not "connect" with him.

The report addressed the sibling relationship between S.D. and Greyson and noted that they had at first been placed together, but were separated due to their interaction with each other. Greyson then had several placements and while he needed to be moved again, S.D.'s placement was not open to having him as well. The department opined that it would be detrimental to remove S.D. from her current placement only to keep the siblings together, as S.D. was thriving and stable in her current placement.

Mother was not present at the contested section 366.26 hearing held February 3, 2022. Mother's counsel argued that the section 366.26 report provided an inadequate assessment regarding the adoptability of Greyson, and that the sibling exception to adoption applied. Counsel called social worker Monica Ramirez, who testified that Greyson was generally adoptable, due to his young age, lack of developmental delays, and physical well-being. Greyson had had some undefined behavioral issues in two of his placements. Ramirez clarified that her report should have used the word "few" instead of "several" when indicating the number of placement changes due to Greyson's behavior. The social worker had observed eight visits between the parents and the children, and the children appeared to leave without showing any emotional distress with regard to their parents or each other.

Ramirez testified that, since Greyson's most recent placement had stated they were not willing to adopt him, another placement was being sought and the department already

6.

had eight families interested. As part of the approval process, the placements would be asked about continuing sibling relationships. S.D.'s placement was not open to the idea of guardianship. As such, if Greyson was to be placed with S.D., S.D.'s placement would be disrupted and another placement would need to be found. According to the social worker, it would be more detrimental to remove S.D. from her placement than to find a new placement for her with Greyson.

The children were initially removed from mother's custody when they were quite young and had not been together for the past year, also contributing to Ramirez's opinion that the two did not have a substantial bond. Ramirez opined that separating the children via adoption was not detrimental due to the benefits of adoption.

S.D., now six years old, testified, and when asked if there was anybody that she did not live with now that she wished lived with her, she said her "auntie" and Greyson, "But I don't want to go with my dad." S.D. testified that she was happy with her caregiver, did not really want more visits with her dad, and liked visits with Greyson. She would be sad if she no longer had visits with Greyson, because "we're brothers and sisters." She would like to live in a home where Greyson was, but repeated several times that she did not want to be with her dad.

Father testified that breaking up the children "wouldn't be good for them." Father described the children's as having a "strong connection" and that they enjoyed each other's company.

The department called Social Work Supervisor Abelky Montano, who testified she had been in the assessment adoption unit for seven of her 22 years with the department. Montano testified that she had no doubt that Greyson was adoptable. She also opined that S.D. had a very strong bond with her caregivers, which would be detrimental if broken. Montano testified that, while Greyson needed to be moved from his current placement, which he had been in since October of 2021, he had had only minimal age-

7.

appropriate behavior issues. He had exhibited more aggressive behavior in the placement in November of 2020, when he had been first placed with S.D.

At argument, the department submitted on the reports and, as to the sibling bond exception, argued "there is nothing here that compels a finding of detriment from adoption." The department argued that Greyson's behaviors did not rise to the level that it would be a problem to find an adoptive home for him. The department argued further that it would look for placement for Greyson that allowed for continued visitation, and the evidence was that detriment would be "worse from disrupting [S.D.'s] placement."

Counsel for the minors agreed that adoption was the best plan and that Greyson would be easily adoptable, considering the number of interested parties. As for the sibling bond exception, counsel for the minors argued that, while the children may want to visit each other, they had not been raised in the same home and had not grown up together or shared experiences. Counsel opined that it would be especially detrimental for S.D. to have to give up her current placement, due to the bond she had with the caregiver.

Mother's counsel asked that the juvenile court not find Greyson adoptable, noting he had five placements and was only three years old, and that the department failed to address his "behavior problems." Counsel argued that, because of Greyson's placement history, if parental rights were terminated, Greyson would end up a "legal orphan," as no one would want to adopt him. As for the sibling bond exception, counsel argued that the department failed to do what it was required to do, namely make efforts to find a home for the siblings together and to provide a meaningful description of the sibling relationship. Counsel noted that the children call each other, share toys and pictures, and that S.D. said she is sad not living with Greyson and that she loves him.

Mother's counsel, noting that the children were separated just over a month into their first foster care placement based on Greyson's behavior issues, argued there was no

evidence of any effort on the part of the department to reunite them or provide sibling visitation.

Father's counsel stated she would "echo and adopt" the arguments made by mother's counsel. Counsel further argued that the beneficial parent-child relationship exception to adoption applied, citing father's regular and consistent visitation with the children "insomuch as he has been able to."

The juvenile court stated that it understood the various arguments, and that it did not necessarily disagree that some of the issues as to Greyson were created by the department, but that "sometimes placements between siblings work out, and sometimes placements don't work out." It found both children adoptable and found that the parent-child relationship exception to adoption did not apply. After explanation, the juvenile court also found that the sibling relationship exception to adoption did not apply, and it terminated mother and father's parental rights.

## DISCUSSION

I.   DID THE JUVENILE COURT ERR IN FINDING THE CHILDREN ADOPTABLE?

Mother and father first challenge the sufficiency of the evidence supporting the juvenile court's adoptability finding for Greyson. We reject their challenge.

"The [juvenile] court was not required to find the children 'generally' or 'specifically' adoptable. [Citation.] It was required only to find by clear and convincing evidence that the children were 'likely' to be adopted within a reasonable time ...." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802; see § 366.26, subd. (c)(1).) When reviewing a finding that a fact has been proven by clear and convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that the children were likely to be adopted. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989. 1011.)

9.

" 'The issue of adoptability ... focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) In determining adoptability, the juvenile court considers the department's adoption assessment report and any other relevant evidence. (§§ 366.21, subd. (i)(l), 366.26, subd. (c)(1).)

Mother and father argue that the finding that Greyson was adoptable was not supported by clear and convincing evidence. They point to the fact that Greyson was first placed into a relative's home for a month, but the relative requested his removal due to his aggressive behavior. He also had behavioral issues with his second placement. His subsequent 10-month placement was prepared to offer permanency to Greyson, but the prospective adoptive family moved out-of-state, requiring Greyson to be placed into yet another home. The fourth home Greyson was placed into initially indicated a willingness to adopt but, within three months, decided they were not "connect[ing]" with Greyson and asked that he be removed. According to mother and father, all of this indicates that Greyson will likely not be adopted and will be left a legal orphan.

We find, however, that substantial evidence supports the juvenile court's adoptability finding. In finding the children adoptable, the juvenile court addressed each child separately. It found S.D. adoptable, noting it was "clear from the testimony today and what we were able to view while we were on the record of the interaction between the care provider and [S.D.] The nurturing and love and affection was obvious." As for Greyson, the juvenile court noted his "disruptive behaviors," which had been described previously as "severe, but that was by a layperson," were in contrast to his more recent behaviors, which had been described as less severe and age appropriate. The juvenile court also noted Greyson was a young age, and that notice of Greyson's need for an adoptive home "essentially went out two weeks ago and there [were] already nine applications," finding this "convincing evidence of adoptability."

10.

We find no error on the part of the juvenile court in finding Greyson was likely to be adopted.

## II. DID THE JUVENILE COURT ERR WHEN IT FOUND THE SIBLING RELATIONSHIP EXCEPTION TO ADOPTION DID NOT APPLY?

Mother and father contend the juvenile court erred in failing to apply the exception to adoption based on avoiding interference with a sibling relationship. (§ 366.26, subd. (c)(1)(B)(v).) We disagree.

There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when termination of parental rights would result in "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

There is a "heavy burden" on the party opposing adoption under the sibling exception. (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) The authors of the legislation envisioned that the applicability of this exception would " 'likely be rare.' " (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 950.) This language from the legislative history has been interpreted to mean "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption," (*ibid.*) "particularly when the proceedings concern young children whose needs for a competent, caring, and stable parent are paramount." (*In re Valeria A.* (2007) 152 Cal.App.4th 987, 1014.)

11.

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L., supra,* 101 Cal.App.4th at p. 952.) If the court determines that the child has a significant sibling relationship and would suffer detriment if that relationship were severed, the court then must weigh the benefit to the child of continuing the relationship against "the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *In re L. Y. L.*, at pp. 952-953.) The sibling bond exception is evaluated from the perspective of the child who is being considered for adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Unlike the beneficial parent-child relationship exception, the juvenile court is permitted to consider the prospective adoptive parent's intent to maintain contact between the siblings. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 293; *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422.)

We do not substitute our judgment for that of the juvenile court as to what is in the child's best interest. (*In re Caden C.* (2021) 11 Cal.5th 614, 641; *In re Zeth S., supra,* 31 Cal.4th at p. 410.)

Mother and father argue that the juvenile court erred in finding the beneficial sibling relationship exception to adoption did not apply because the evidence showed a bond between S.D. and Greyson that outweighed the benefits to adoption. We disagree.

In addressing the issue of the sibling relationship exception to termination of parental rights, the juvenile court stated it needed to address the nature and extent of the relationship between S.D. and Greyson—"[w]hether they [were] raised in the same home, whether they share significant common experiences, whether there is an existing and close, strong bond, and is the ongoing contact in the best interest, including long-term emotional interest as compared to the benefits of legal permanence through adoption."

In doing so, the juvenile court stated it had considered all of the reports and the testimony and highlighted "a few things." It then stated that "watching the interaction between S.D. and the care provider that if anything was detrimental, it would be severing

that relationship," and the department was trying to do what it could to "assist in maintaining that relationship." It also noted that social worker Ramirez had testified that the children were doing better not being placed together, as Greyson did best without additional children in the home.

The juvenile court also addressed the testimony of S.D., who stated that she was happy after visits, and expressed that one of the reasons she was happy was because she loved her care provider. The juvenile court did state that S.D. expressed a desire to see Greyson more " '[b]ecause he's my brother, and we don't get to see each other that much.' " It also noted that S.D. did not want to live with her father. The juvenile court then stated that it was clear from S.D.'s testimony that she was happy in her placement and did not want to leave.

The juvenile court noted that S.D. and Greyson, who had initially been placed together, had been separated since November of 2020, "due to Greyson's behaviors," which included randomly biting others, including S.D. S.D. had said that she liked the first placement but complained that Greyson fought with her. Since the two have been separated, they have had visits, shared toys, colored together, but also did not show any emotional distress at the end of those visits.

The juvenile court concluded:

"These two children have been apart for over a year. [S.D.] is thriving in her placement, and Greyson appears to be doing better living in a single-sibling household. They were both separated at a young age. When asked, 'Are they raised in the same home when they were separated?' they were separated when Greyson was only two years old; [S.D.] was four at the time. When asked 'Do they share significant common experiences?' the Court cannot say they [were] significant experiences. It's experiences of a two-year-old and a four-year-old. They play together; they color together. You can take two individuals of that age that are [not] siblings, and they would share that same common experience. The Court is not of the opinion that is a significant experience.

13.

"When considering whether it's an existing and close, strong bond, do they have a bond? Yes. They want to see each other; they want to call one another. When the Court weighs that of 'does the ongoing contact and the best interest, including the long-term emotional interest … , as compared to the benefit of the legal permanency of adoption—in weighing the evidence before the Court, this Court is of the opinion it would do more damage than good if it were to find that adoption was not the appropriate plan. [¶] … [¶]

"The court is of the opinion that the sibling exception to the adoption burden has not been met."

Mother and father contend that their case is similar to the facts in *In re Naomi P.* (2005) 132 Cal.App.4th 808 (*Naomi P.*). The child in *Naomi P.* was placed in a legal guardianship with a relative and had weekly visits with her siblings in her grandmother's home, where her siblings lived, sometimes spending the whole weekend with them. (*Id.* at pp. 812, 820.) That guardianship was terminated when the relative guardian was alleged to have neglected her own children. (*Id.* at p. 813.) After the child was moved to the home of a family friend who wanted to adopt her, frequent visits with her siblings and grandmother continued with some of those visits lasting several hours to the entire day. (*Id.* at pp. 818-819.) At the section 366.26 hearing, the juvenile court found the sibling relationship exception applied and ordered a permanent plan of legal guardianship, based on the strength and importance of the children's relationship with each other and the court's concerns about the foster mother's willingness to maintain that contact. (*Naomi P., supra,* at p. 821.) The Court of Appeal, applying a substantial evidence standard, rejected a contention by the social services agency that the juvenile court should have terminated parental rights. (*Id.* at p. 824.)

We find *Naomi P.* factually distinguishable. Here, while S.D. voiced a love for Greyson and wished to visit him, she was most content in her placement with her prospective adoptive parent. More significantly for our purposes, *Naomi P.* is procedurally distinguishable because it involved a different burden of proof and standard of review; the order under review in *Naomi P.* was that the sibling exception *applied*.

14.

(*Naomi P., supra,* 132 Cal.App.4th at p. 824.) That order was entitled to deference and could only be reversed on appeal if the juvenile court abused its discretion or made a factual finding unsupported by substantial evidence. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) To say the juvenile court's order was properly affirmed based on a substantial evidence standard is not to say the juvenile court in *Naomi P.* would have erred in finding there was insufficient evidence to support the sibling relationship exception as a matter of law. Thus, *Naomi P.* does not support mother and father's claim the sibling exception compels reversal in the case before us.

We find no error on the part of the juvenile court in determining that the sibling relationship exception to adoption did not apply.

### III.   MUST THE CASE BE REMANDED FOR A BONDING STUDY?

Mother and father also contend that, even if this Court declines to reverse based on lack of substantial evidence supporting the sibling relationship exception to termination of parental rights, we should reverse the order and remand with instructions to conduct a new section 366.26 hearing with the benefit of a bonding study to assess the sibling relationship exception. We find their request meritless.

In assessing the applicability of the parent-child benefit relationship exception (another exception to termination of parental rights but not at issue here), courts have found that any party may request a bonding study, and the court has discretion to order one "to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869; *In re Caden C., supra,* 11 Cal.5th at p. 633, fn. 4 ["Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony."].)

Bonding studies are also relevant to the sibling benefit exception, especially when young children who are less articulate are involved. (*In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018, disapproved of on other grounds by *In re S.B.* (2009) 46 Cal.4th

529, 537, fn. 5.) "In a case where the strength of a bond between very young siblings is difficult to determine because of the young age of the children involved, court-ordered sibling bond studies may be appropriate. Such studies would be helpful—in some cases might even be indispensable—in determining the applicability of section 366.26, subdivision (c)(1)[(B)(v)]." (*In re Jacob S.*, *supra,* at p. 1018.) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.)

Here, neither mother nor father made a request for a bonding study. They have therefore waived, for appellate purposes, their contention that the juvenile court should have required a bonding study before terminating their parental rights. (*In re Lorenzo C., supra,* 54 Cal.App.4th at p. 1339.) Even had they made such a request, "The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.) But neither parent has shown that the juvenile court's failure to order one sua sponte was an abuse of discretion. As addressed above, the juvenile court had substantial evidence from which to determine that the sibling relationship exception to termination of parental rights did not exist, and we reject mother and father's claim that a bonding study is in order.

IV. DID THE DEPARTMENT FAIL TO ADEQUATELY ADDRESS WHETHER THE CHILDREN WERE INDIAN CHILDREN UNDER ICWA?

Mother and father contend the juvenile court's finding that ICWA did not apply was not supported by substantial evidence because the record does not reflect sufficient inquiry and notice by the department of paternal and maternal family members regarding Native American ancestry. The department concedes the issue.

"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value

16.

supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8; see *In re J.C.* (2022) 77 Cal.App.5th 70, 76; *In re T.G.* (2020) 58 Cal.App.5th 275, 287.) ICWA provides: " 'In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.' [Citation.] This notice requirement, which is also codified in California law [citation], enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding." (*In re Isaiah W.*, *supra,* at p. 5; see 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3, subd. (a); *In re J.C., supra,* at p. 76; *In re H.V.* (2022) 75 Cal.App.5th 433, 436.)

" ' " 'Federal regulations implementing ICWA ... require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.] The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." ' " ' " (*In re J.C., supra,* 77 Cal.App.5th at p. 77; see 25 C.F.R. § 23.107(a).) California law " 'more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the

17.

dependency proceeding "is or may be an Indian child." ' " (*In re J.C.*, *supra,* at p. 77; see § 224.2, subd. (a); *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742 (*Benjamin M.*).)

"Section 224.2 ' " 'creates three distinct duties regarding ICWA in dependency proceedings.' " ' " (*In re J.C., supra,* 77 Cal.App.5th at p. 77; see *In re H.V., supra,* 75 Cal.App.5th at p. 437; *In re Charles W.* (2021) 66 Cal.App.5th 483, 489.) "First, section 224.2, subdivision (b) requires the child protective agency to ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*In re J.C., supra,* at p. 77; see *In re H.V., supra,* at p. 437; Cal. Rules of Court, rule 5.481(a)(1).) Although this duty is "commonly referred to as the 'initial duty of inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and continues throughout the dependency proceedings." (*In re J.C., supra,* at p. 77.)

"Second, if the court or child protective agency 'has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child,' the court and the Department 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' " (*In re J.C., supra,* 77 Cal.App.5th at p. 78; see § 224.2, subd. (e); *In re H.V., supra,* 75 Cal.App.5th at p. 437; Cal. Rules of Court, rule 5.481(a)(4).) "Third, if the further inquiry ' " 'results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply.' " ' " (*In re J.C.*, at p. 78; see 25 U.S.C. § 1912(a); § 224.3, subd. (a); *In re H.V.*, at p. 437.)

" ' " 'The juvenile court must determine whether ... ICWA applies to the proceedings.' " [Citation.] "If the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that

[ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." ' " (*In re J.C., supra,* 77 Cal.App.5th at p. 78; see § 224.2, subd. (i)(2); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1050; Cal. Rules of Court, rule 5.481(b)(3).) The court may not, however, "find that ICWA does not apply when the absence of evidence that a child is an Indian child results from a [child protective agency] inquiry that is not proper, adequate, or demonstrative of due diligence ...." (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408; see *In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.)

Mother and father argue that the department failed to conduct an adequate inquiry at both initial inquiry and notice stages into whether the children may be Indian children. They contend that, while father disclosed that he had Blackfoot and Choctaw heritage, the department did not adequately continue the inquiry and failed to include information on the November 5, 2020, ICWA-030 of a paternal aunt, with whom the department had contact. The record as to mother is confusing. According to the November 5, 2020, ICWA-030 sent to the tribes mentioned by father, it states that mother reported on October 6 and October 21, 2020, that she had no Indian heritage. However, the section 366.26 report filed a year later on October 21, 2021, states that mother had said on October 1, 2021, that she was not sure if she had any Indian heritage. However, this was long after the juvenile court determined that the ICWA did not apply, and the department did not then question maternal grandfather and grandmother, and several maternal aunts and a maternal uncle with whom the department had contact about any possible Native American ancestry. (See *In re H.V., supra,* 75 Cal.App.5th at p. 438 [child protective agency's "first-step inquiry duty under ICWA and state law was broader" than simply asking the parent about possible Indian ancestry, "requiring it also to interview, among others, extended family members"]; see also *In re S.R.* (2021) 64 Cal.App.5th 303, 314 [section 224.2 "obligates the court and child protective agencies to ask all relevant involved individuals ... 'whether the child is, or may be, an Indian child' "].)

19.

Furthermore, nothing in the record shows the juvenile court inquired further about the department's efforts. (See *In re J.C., supra,* 77 Cal.App.5th at p. 79 [juvenile court "did not satisfy its duty to ensure the [child protective agency] adequately investigated whether [the child] may be an Indian child" where there was "no indication in the record that, after the detention hearing, the juvenile court gave ICWA another thought in the almost three years of this dependency case"].)

When error in the initial inquiry is found, there is a disagreement among the appellate court's as to whether the failure to discharge the duty of initial inquiry under section 224.2, subdivision (b), constitutes prejudicial, reversible error.

The published cases seem to fall into the following groups: one concludes that the error warrants reversal in every case because the duty to inquire was mandatory and unconditional. (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542, 556; *In re K.R.* (2018) 20 Cal.App.5th 701, 709.) In *Y.W.* the court rejected the notion that a parent should have to make a factual showing of prejudice, emphasizing "the point of the statutory requirement that the social worker ask all relevant individuals whether a child is or may be an Indian child: to obtain information the parent may not have." (*Y.W., supra,* 70 Cal.App.5th at p. 556.) The rule establishing automatic reversal without any reason to believe Native American heritage exists could potentially reward parental gamesmanship and undermine the policy favoring prompt resolution of juvenile dependency cases. It also potentially runs afoul of the constitutional requirement that judgments can only be reversed on appeal in cases where a manifest miscarriage of justice has been shown. (Cal. Const., art. VI, § 13.)

Another group of cases concludes that the error does not warrant reversal unless a "miscarriage of justice" is demonstrated to have occurred as a consequence of the failure to inquire about Native American heritage. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a

miscarriage of justice"].) These cases would allow a parent to make an offer of proof on appeal, showing there is reason to believe Native American heritage exists. (See, e.g., *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1388; *In re N.E.* (2008) 160 Cal.App.4th 766, 770; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431.) In the absence of such an affirmative showing, this line of cases concludes the judgment should be affirmed. But this rule allowing reversal only in cases where the parent makes at least an offer of proof regarding Native American heritage amounts to a rule that effectively shifts the department's unconditional statutory burden to the parents in cases where the department has failed to fulfill it.

Another option is the self-described "middle ground" approach taken in *Benjamin M., supra,* 70 Cal.App.5th 735, in which the appellate court would determine, on a case by case basis, whether the record reflects there are known relatives identified by the child welfare agency, who appear to have been able to shed light on the issue of Native American heritage. *Benjamin M.* held that the failure to inquire would be reversible error if "there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Id.* at p. 744.) Thus, the *Benjamin M.* court found the failure to inquire about Native American heritage in that case, regardless of whether the information was likely to show that the child is an Indian child, was reversible error because the agency "failed its duty of inquiry by not asking 'extended family members' [citation] such as Father's brother and sister-in-law whether Benjamin has Indian ancestry on his paternal side.... [T]he missing information here was readily obtainable, as CFS had spoken to Father's sister-in-law and Father's brother and has the address (through Mother) for either that brother or another one. Moreover, the information those relatives could have given would likely have shed meaningful light on whether there is reason to believe Benjamin is an Indian child." (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.)

The *Benjamin M.* analysis seems to rest on the distinction between cases where it appears an inquiry could have been easily conducted—because the record demonstrates relatives were known and readily accessible—and cases where the record does not reflect the inquiry would have been so easy. (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.) But the department's obligation to make the ICWA inquiry standard does not appear to be based upon the ease of compliance.

Recently, in *In re Dezi C.* (2022) 79 Cal.App.5th 769, the court proposed a "reason to believe" rule, in which an agency's failure to conduct a proper initial inquiry into a dependent child's Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an Indian child, such that absence of further inquiry was prejudicial to the juvenile court's ICWA finding. (*Id.* at p. 779.) A reviewing court would have "reason to believe" further inquiry might lead to a different result if the record indicates someone reported possible Indian heritage and the agency did not follow up on that information, or if the record indicates the agency never inquired into one of the two parents' heritage at all. (*Ibid.*)

Here, father stated that he might have Native American heritage with the Blackfeet and Choctaw tribes through his father and grandfather, the children's paternal grandfather and great-grandfathers. That information, which consisted of names, birthdates and places of birth, was relayed by the department to the applicable tribes. However, the department had contact with various other paternal relatives over the course of the dependency and did not question any of them as to their possible Indian heritage.

As for mother, while she at first stated she did not have any Indian heritage, she later stated that she was not sure. By this time the juvenile court had already determined that the ICWA did not apply and the department did not follow up on mother's uncertainty. Again, the department had contact with various maternal relatives it could have questioned, but did not.

22.

Section 224.3, subdivision (a) implicitly recognizes that any finding of ICWA inapplicability before proper and adequate notice has been given is not conclusive and does not relieve the court of its continuing duty to inquire into a child's Indian status in all dependency proceedings. This, along with the department's concession that error occurred, lead us to conclude that the juvenile court's finding that ICWA did not apply was not supported by substantial evidence and limited remand is required.

## DISPOSITION

The finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the department to comply with the inquiry provisions set forth in section 224.2.

If, after the court finds adequate inquiry has been made consistent with the reasoning in this opinion, the court finds ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court finds ICWA does not apply, the finding that ICWA does not apply to the case shall be reinstated.

In all other respects, the court's orders terminating parental rights are affirmed.

FRANSON, J.

I CONCUR:

SMITH, J.

23.

POOCHIGIAN, Acting P. J., Concurring.

I concur.  I write separately to express concern about the adequacy of consideration of the sibling relationship in separating the children.  There appears to be ample evidence in the record to support termination of parental rights.  While the issue of the "sibling relationship" exception relates to the appropriateness of termination of parental rights, the rationale undergirding the exception is the well-being of the children who are affected.

Here, we have two young children, S.D. and Greyson D., who were separated and have lived apart for nearly two years.  S.D. was placed in the home of a relative.  Greyson, on the other hand, has been the subject of at least four foster placements.  Yet, he was deemed to be "adoptable."  This is not particularly surprising given the descriptions of his deportment in the record.  That is, while some behaviors were identified (e.g., fighting with S.D. when they were together), there were reports of his being well adjusted and healthy – with the overall description of his conduct as not untypical of many children at his young age.  Although the children expressed a desire to be together, S.D.'s care providers indicated they were unwilling to take both children because of limitations of space at their home, and "they feel they would be taking away attention that [S.D.] needs."

While there is some discussion of the sibling relationship in the record, I wonder whether there was adequate focus on the value of keeping the siblings together.  Where the approval of a willing caregiver is limited to one child, a question arises as to the level of consideration that should take place for evaluating alternatives that would result in joint placement.  This is not to speculate that such an alternative was available and doable.  The point is simply that given the public policy favoring maintaining the relationship between siblings in such cases, it is important to be satisfied that effort was made to keep the children together versus separation and serial placement.  From the present record, it does not appear that the children's separate placements were critically examined until the final stage of the proceedings when S.D. had established a stronger bond with her care provider.

Welfare and Institutions Code section 16002 states that it is the Legislature's intent to preserve and strengthen the family unit by "ensuring that when siblings have been removed from their home, … the siblings will be placed together, unless it has been determined that placement together is contrary to the safety or well-being of any sibling." (Welf. & Inst. Code, § 16002, subd. (a)(1).)  To effectuate this intent, the responsible agency "shall make a diligent effort in all out-of-home placements of dependent children … , including those with relatives, to place siblings together in the same placement, and to develop and maintain sibling relationships.  If siblings are not placed together in the same home, the social worker … shall explain why the siblings are not placed together and what efforts [he or she] is making to place the siblings together or why making those efforts would be contrary to the safety and well-being of any of the siblings." (*Id.* at subd. (b).)  Additionally, "[w]hen placement of siblings together in the same home is not possible, a diligent effort shall be made, and a case plan prepared, to provide for ongoing and frequent interaction among siblings until family reunification is achieved, or, if parental rights are terminated, as part of developing the permanent plan for the child." (*Ibid.*)  The statute sets forth a legislative goal of placing siblings together but does not create a mandatory duty to do so. (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 642 ["[P]lacement with siblings is a legislative goal that does not create a mandatory duty. It is a factor to be considered in making the discretionary foster care placement"].)

In conclusion, despite my qualms regarding adequacy of early consideration of the sibling relationships in dependency proceedings and the unfortunate circumstances relative to sibling separation in this case, we cannot say there was insufficient consideration of the siblings' relationship at the end of the process nor that the court abused its discretion.

POOCHIGIAN, Acting P. J.

2.