Filed 12/22/23  In re J.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br>E.C.,<br><br>        Defendant and Appellant. | A168283<br><br>(Marin County Super. Ct. No. JV27161A) |

E.C. (Mother) appeals from an order terminating her parental rights over her now four-year-old son (Minor).  She argues that the order must be reversed because the juvenile court (1) abused its discretion in denying her request for a continuance to allow for a bonding study to be conducted; and (2) erred in declining to apply the beneficial relationship exception under Welfare and Institutions Code, section 366.26, subdivision (c)(1)(B)(i).[1]  We disagree and affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

# BACKGROUND

## A. *Initial Petition*

In November 2021, the Marin County Department of Children and Family Services (Department) filed a petition alleging Minor was within the jurisdiction of the juvenile court because he was at substantial risk of serious harm due to Mother's substance abuse. On November 16, police had responded to the home because Minor, who was two years old at the time, was found running down the street alone. According to the police report, Mother's breath test had a reading of 0.22 percent and there were several open and closed containers of alcohol inside the home. Mother reported she had "drank too much" and fallen asleep. Mother was arrested for child endangerment and Minor was placed into protective custody. The police officer also reported having "several contacts with [Mother] in the past and in every case . . . [Mother] has been under the influence of alcoholic beverages."

The petition further alleged that Minor was at substantial risk of serious harm due to Mother's failure or ability to protect him from domestic violence in the home. On October 13, 2021, police had responded to a call after a physical altercation between Mother and Minor's father (Father) while there was an active restraining order against Father. Minor was hiding and crying in a closet, and later abandoned in the parking lot of the apartment.

The petition also alleged abuse of a sibling. (§ 300, subd. (j).) Minor's half sister had been removed from her parents' care on multiple occasions between 2013 and 2016 due to substance abuse and domestic violence. Parental rights were ultimately terminated, and she was adopted by her paternal grandparents.

In its November 2021 detention report, the Department noted that Minor "appeared physically healthy but developmentally had no language" and "appeared to have an odd shaped head as if he was not carried a lot as an infant (as evidence by his flatten bead of the head)." Minor's "only way of communication was pointing and grunting to people or things." Minor's resource parents reported other "potential developmental delays," including inability to feed himself or chew and swallow on his own, and lack of potty training. They reported that Minor showed no signs of looking for his Mother. At the November 19 detention hearing, Mother submitted to the Department's recommendation that Minor be detained. The court ordered supervised visitation between Minor and Mother.

According to the Department's December 2021 report, Mother reported that she had begun "drinking heavily" sometime before 2012 and had completed an in-patient program while Minor was a baby, but then relapsed. Mother reported that "she knows she has a serious problem with alcohol and cannot drink." Minor had "adjusted well" to his resource home, was "start[ing] to speak more, namely repeating words," and received a medical referral for his expressive speech delay. Mother had attended almost all of her twice-weekly supervised visits. The report stated: "Visits have been observed to be positive and interactive, and [Minor] appears happy during the visits." Mother and Minor were "observed to be connected during supervised visits," and "[d]uring these visits, [Minor] goes to [Mother] for comfort and affection."

At the January 4, 2022 jurisdiction and disposition hearing, the juvenile court found the allegations in the petition true and ordered reunification services to Mother.

## B. *Initial Reunification*

In June 2022, the Department recommended that Minor be reunified with Mother and that family maintenance services be ordered. Mother reported that she had maintained her sobriety and had shown "consistent effort in testing clean." Minor continued to reside at a resource home and his "language and expression" had improved. The social worker observed a "healthy bond" between Minor and the resource parent, and that Minor would "usually stay by her side and listen to her instructions." At Minor's first doctor appointment, where both the resource parent and Mother were present, Minor "stayed with the resource parent and would not listen or go to [Mother]." Minor was "more comfortable" around both the resource parent and Mother at the second doctor's appointment. During the supervised visits, the social worker had observed Minor "bonded" to Mother. Minor would run to Mother, sit on her lap, and hold her hand. Mother had "consistently been loving, attentive, and appropriate" towards Minor. Visits became unsupervised, with longer and more frequent visits as part of a transitional plan towards reunification. At the June 28 hearing, the family court adopted the Department's recommendation and returned Minor to Mother's care.

## C. *Section 387 Petition*

In November 2022, the Department filed a section 387 petition[2] to re-remove Minor because Mother had failed to maintain her sobriety. Mother tested positive for alcohol on October 27. According to the Department's report, the social worker instructed Mother to test again on November 3. Mother did not do so, initially stating she had "forgotten," but then refusing

---

[2] Section 387 provides, in relevant part, that an order "changing or modifying a previous order by removing a child from the physical custody of a parent . . . shall be made only after noticed hearing upon a supplemental petition."

4

because the social worker "no longer trusted in her" and would be sending Minor to live with paternal family members. Mother reported that Father had come to the home two weeks prior with alcohol and methamphetamine, and Mother agreed to live with Father (despite the restraining order). Mother reported that she drank the alcohol, and that Father used methamphetamine while Minor was in the home.

The social worker visited the home unannounced on November 3, observing through a window that Mother was asleep on a sofa and Minor was laying over her body with a phone in his hands. After seeing the social worker, Minor poked Mother awake. Mother appeared intoxicated; there was an almost empty open bottle of alcohol on the sofa in reach of Minor and another empty container under Minor's toys. Mother initially denied drinking, but then stated she had consumed alcohol the previous night and that morning. During this conversation, Minor "appeared to be angry as evidenced by throwing things at [Mother], biting her stomach, and biting the sofa." Minor appeared to have a dirty diaper and "was drinking water out of a plastic bottle that had pens inside of them."

When the social worker indicated that Minor would be detained, Mother left the home. When Mother returned 25 minutes later, she told the social worker that "if she had smoked instead of consuming alcohol, 'I would be fucking you up right now.'" When the social worker walked outside with Minor, Mother stated she was going to sleep and closed the door. The next day, Mother called the social worker and stated that she had relapsed, but "it was not anyone's fault."

The juvenile court held a detention hearing on November 8, 2022. Mother was not present. The court ordered the Minor detained. It also ordered supervised visitation with Mother.

5

**D.** *Section 387 Jurisdiction and Disposition*

The Department filed a December 2022 report recommending the court find the previous disposition was not effective, continue to declare Minor a dependent, and terminate reunification services to Mother. When asked about the lead up to her current relapse, Mother referenced Minor's attendance in his early intervention program in late September. Mother "vaguely described initially drinking on her own when [Minor] was not around but over time, started to lose control of things and would drink when he was with her." Mother had called law enforcement and was hospitalized in mid-November "because after drinking for the last three weeks, she was vomiting blood and had blood in her stool." The report indicated that since being in the early intervention program, Minor had not met any of his educational goals. The social worker observed that Minor was "positively engaged with the resource parent." Minor's twice-weekly visits with Mother were described as "very positive with both of them showing affection throughout the visit."

Mother did not contest the section 387 allegations, but requested a contested hearing on the disposition recommendation. At the January 24, 2023 hearing, the juvenile court found the allegations true and adopted the Department's recommendation to terminate reunification services to Mother. It also ordered supervised visitation between Minor and Mother.

**E.** *Section 366.26 Hearing*

In May 2023, the Department filed a report recommending termination of Mother's and Father's parental rights and adoption as the permanent plan for Minor under section 366.26. The Department indicated that Minor's paternal grandparents in Mexico had reached out about adopting Minor, and

6

their home had been approved for placement by the corresponding local agency.

The Department reported that Minor "appeared comfortable" in his current resource home, and that his language communication skills had "blossomed" in the prior weeks. During the supervised visits, Mother and Minor "laughed, played games together and read books." Mother "interacted with [Minor] in a developmentally appropriate way." The Department stated that continued contact with Mother post-adoption would be "beneficial" as Minor had "made statements saying he misses her while in his current resource home."

A report filed by Minor's court-appointed special advocate stated that Minor "appears to have quickly bonded with his current resource parent." It continued: "Initially, [Minor] constantly sought his resource parent's approval, exhibited a desire to reunite with her immediately after school or daycare, and expressed anger when they were separated. That clinging behavior has abated, but the bond continues to be strong." Minor had also met two of his four education goals, and was making "significant progress" on the other two.

At the section 366.26 hearing on June 15, 2023, Mother's counsel requested a continuance "for at least three months" to allow for a bonding study to be conducted, and to confirm the permanent plan for Minor's placement.[3] The Department opposed the request, and Minor's counsel added: "I don't know, as county counsel indicated, that a bonding study would give us more." Mother's counsel also argued that the beneficial

---

[3] Mother's counsel asked that the court defer ruling on the continuance request until after the evidence in the section 366.26 hearing had been entered, as she represented that it "might sway the court."

relationship exception in section 366.26, subdivision (c)(1)(B)(i) was applicable and Mother's parental rights should not be terminated.

The Department's May 2023 report was admitted into evidence. The social worker testified that the plan was for Minor to be placed with his paternal grandparents in Mexico. She testified that Minor had once told his resource parent that he missed Mother. She also testified that Minor had run to Mother at the start of some recent supervised visits and called her " 'Mommy,' " but that Minor does not have difficulty separating from Mother at the end of the visits and goes readily to his resource parent.

No other evidence was presented at the hearing. When the matter was submitted, the court indicated that it needed the opportunity to consider and review issues raised at the hearing.

## F. *Juvenile Court's Ruling*

The juvenile court issued its ruling on June 27, 2023. As for Mother's request for a continuance for a bonding study, the court stated: "First, there is no requirement for a bonding study by statute. It is not a prerequisite to terminating parental rights." Citing *In re Richard C.* (1998) 68 Cal.App.4th 1191 (*Richard C.*), it continued:

"So is it necessary or important in this case? Here, as noted, [Minor] has been removed twice. Mother received about 18 months of services between the two family reunification and the family maintenance matters. By now, a parent's right to develop further evidence regarding her bond with a child is approaching the vanishing point. . . .

"It is doubtful that a bonding study would be useful to this court. This court has handled this case from the onset. The social worker's reports are comprehensive. . . . There is sufficient evidence here to evaluate the bond.

8

"The request comes late in the proceedings, months after terminating reunification services. This would require additional delays in permanency planning. The Legislature did not contemplate last-minute efforts to put off permanent placement.

"While it is not beyond the court's discretion to order a bonding study under compelling circumstances, the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes and with due process . . . ."

As for the termination of parental rights, the court began by finding Minor adoptable. Then, regarding application of the beneficial relationship exception, the court recited the three-element legal framework from *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). It found the first element had been met based on undisputed facts: Mother had regular visitation with Minor.

On the second element, the court stated that a parent "must establish that the child has a substantial positive emotional attachment to the parent, the kind of attachment implying that the child would benefit from continuing the relationship." It explained: "And how do we determine that?"

"Well, we look at several factors: One is the age of the child. [Minor] just turned four. Next, the portion of the child's life spent with the parent. [Minor] has been out of Mother's custody for 14 months, almost a third of his life. Next, the positive or negative interaction between [the] parent and the child.

"Here, the visits with Mother are positive. The social worker's report indicates that Mother is sweet with [Minor], that they love each other and that it would be beneficial for Mother to maintain contact with [Minor] post adoption.

9

"There was also a reference that [Minor] has made statements saying he misses Mother while at his current resource home. There was also testimony that [Minor] separates from Mother easily with no distress, that [Minor] has expressed his sadness on only one occasion and that he is thriving in his resource home. This is evidence that he is not showing distress being in their care.

"As noted in the case of [*In re*] *Autumn H.* [(1994) 27 Cal.App.4th 567], the interaction between a birth parent and a child will always confer some incidental benefit to the child, but that is not enough. Here, I cannot help but note that [Minor] has been removed from Mother twice. [Minor] has experienced negative interactions for his whole life while in Mother's care. A parent's struggles with the issues leading to dependency may be relevant to the extent they impact the three prongs.

"It is not the basis of this court's finding, but Mother's struggles with abuse, substance abuse, stretch back over a decade and are relevant to the extent they impact a positive or negative interaction between [Minor] and Mother and to the extent that they have inevitably lessened a parental bond made and broken for the duration of the child's life."

On the third element, the court stated that "we look to [Minor's] needs. As noted by [M]inor's counsel, the benefits of adoption far outweigh [Minor's] relationship with Mother." Minor's counsel had argued that "this case does really depend on the third prong under *Caden C.* . . . [¶] . . . [¶] I do think this is a kid who has moved several times, has experienced a lot of trauma. We know that from his issues with speech, he's made a lot of progress, is doing well. . . . [¶] And the benefits of adoption far outweigh continuing the relationship he does have with his mom."

10

The juvenile court terminated Mother's and Father's parental rights and ordered adoption as the permanent plan. Mother appealed.

## DISCUSSION

### I. No Abuse of Discretion in Denying Bonding Study Request

Mother argues that the juvenile court abused its discretion in denying her request for a continuance to allow for a bonding study to be conducted.[4]

As the juvenile court correctly noted, and Mother concedes, "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) Instead, a bonding study is one of the tools in the toolkit available to the court to help assess the relationship between a minor and parent. (See *Laurie S. v. Superior Court* (1994) 26 Cal.App.4th 195, 202 [evaluation under Evid. Code, § 730 is an " 'information-gathering tool' "].) Accordingly, the court's decision regarding whether to employ that tool is an evidentiary ruling we review for abuse of discretion. (*In re Lorenzo C.*, at p. 1338.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

The juvenile court's ruling here was not an abuse of discretion. The court aptly concluded, along with Minor's counsel, that a bonding study was unlikely to be useful in this case at this stage. There was no question that Mother's substance abuse made her "unable to provide regular care" for Minor, to the point of risking "serious physical harm to the child, or a

---

[4] We need not and do not address Mother's argument that the juvenile court also abused its discretion on her prior motion for a bonding study made at the January 24, 2023 dispositional hearing. Mother did not appeal that ruling.

substantial risk of such harm." (*In re N.R.* (Dec. 14, 2023, S274943) ___ Cal.5th ___ [2023 Cal. LEXIS 6777, pp. *33–*34].) The court explained that the Department's reports were "comprehensive" and there was "sufficient evidence" for the court to evaluate the bond. Among other things, the Department had filed six reports detailing the interactions between Minor and Mother across the two years since dependency proceedings had been initiated. Citing *Richard C.*, the court explained that the timing of the request—at the section 366.26 hearing, six months after Mother's reunification services were terminated—supported denial.

Mother now argues that *Richard C.* is "materially distinguishable." We disagree. In that case, the parent had requested a bonding study at the section 366.26 hearing because her visitation was previously sporadic, but had been regular for the past year. (*Richard C.*, *supra*, 68 Cal.App.4th at p. 1194.) The appellate court affirmed the denial of the request. (*Id.* at p. 1197.) It explained: " 'At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent.' " (*Id.* at pp. 1196–1197, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 (*Autumn H.*).) Given Mother appears to have had more consistency in her visitation than the parent in *Richard C.*, this principle applies with even greater force as the bond between Minor and Mother was apparent and well documented in the evidence already available to the juvenile court.

Mother contends next that *Richard C.* has "questionable reliability" after *Caden C.* Again, we disagree. In *Caden C.*, the juvenile court held a section 366.26 hearing at which it received testimony, department reports, a bonding study performed by the mother's expert, a clinical consultation

report, and a letter from the child. (*Id.* at p. 627.) Our Supreme Court noted that the juvenile and appellate courts found the bonding study "informative" in that case, and advised courts to "seriously consider, where requested *and appropriate*, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4, italics added.)[5] *Richard C.* does not contradict that guidance. It only suggests that a bonding study *request* made at the section 366.26 hearing *might* be less useful, given the time that has elapsed in the proceedings and other evidence that has already developed, and therefore less appropriate in such circumstances. (*Richard C., supra,* 68 Cal.App.4th at pp. 1196–1197.)

Finally, Mother argues that the juvenile court's concern about the months-long delay associated with the continuance request was "misplaced" because Minor had not yet been placed with his paternal grandparents in Mexico. As a preliminary matter, the court made clear that this was not the dispositive factor in its analysis, clarifying it still had the discretion to order a bonding study if there were "compelling circumstances" to do so. In any event, Mother provides no authority that consideration of such delay for a bonding study request at the section 366.26 stage constitutes an abuse of discretion. "Our Supreme Court has repeatedly emphasized the shift in emphasis at the section 366.26 hearing . . . ." (*Richard C., supra,* 68 Cal.App.4th at p. 1195.) Family preservation " 'is one of the goals of the dependency laws' " and is of " 'critical importance' " when a child is removed from parental custody, but " 'Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody

---

[5] Mother also cites *In re Jacob S.* (2022) 104 Cal.App.4th 1011 for the proposition that bonding studies may be helpful in certain circumstances, but the particulars of that case are not material here as it involved the usefulness of *sibling* bond studies when siblings are young. (*Id.* at p. 1018.)

and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability.'" (*Ibid.*) Accordingly, it seems well within the court's discretion to have considered the delay to permanency associated with Mother's request.

In sum, we conclude the juvenile court did not abuse its discretion in denying Mother's request for a continuance to allow for a bonding study to be conducted.

## II. No Error in Declining to Apply Beneficial Relationship Exception

Mother argues that the juvenile court erred in declining to apply the beneficial relationship exception under section 366.26, subdivision (c)(1)(B)(i). "The beneficial relationship test is an exception to the presumptive rule of terminating parental rights after reunification efforts have failed, in order to free a child for adoption." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1067.) The parent asserting the beneficial relationship exception must show three elements by a preponderance of evidence: (1) "regular visitation and contact" with the child; (2) the child "has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) As described above, the first element is not at issue here as the court found Mother had regular visitation with Minor based on undisputed facts.

Turning to the remainder of the test, we review the juvenile court's determination on the second element for substantial evidence. (*In re Eli B.*, *supra*, 73 Cal.App.5th 1061.) We review the third element "under a hybrid

14

standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*Id.* at pp. 1067–1068.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' "[6] (*Ibid.*)

With this framework in mind, we turn to Mother's four arguments regarding the court's ruling on the beneficial relationship exception here.

## A. Specificity of Findings

Mother argues that the juvenile court "did not make specific findings regarding the second two prongs of the test and appears to have conflated them." We disagree. On the second element, the court indicated that supervised visits had been "positive," but "incidental benefit to the child" was not enough and Minor "has experienced negative interactions for his whole life while in Mother's care" resulting in a "lessened" and "broken" bond. On the third element, the court specifically found that "the benefits of adoption far outweigh [Minor's] relationship with Mother."

_____

[6] Mother cites *In re I.W.* (2009) 180 Cal.App.4th 1517 and appears to suggest there is more to this substantial evidence standard for the determination that she failed her burden on the second and third elements. That case merely states that the standard is not met when uncontradicted evidence *compels* a finding that a parent carried his or her burden *as a matter of law*. (*Id.* at p. 1528.) As detailed below, there was no such evidence here.

Even if the juvenile court did not state its specific findings on the record, "we are aware of no requirement—and [Mother] cites no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. To the contrary, we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)

## B. Sufficiency of Evidence on Second Element

Mother argues next that there was insufficient evidence to conclude she had failed her burden on the second element: that Minor had a substantial, positive, emotional attachment to her.

As the juvenile court recognized, it is not enough to show that interactions with Mother conferred "some incidental benefit" to Minor. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the parent as more than a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 (*B.D.*).) The relationship "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between

16

parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Autumn H.*, at p. 576.) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

We conclude there was substantial evidence supporting the court's finding that Mother failed her burden on this second element. Minor was two years old when he was removed from Mother and spent 14 months—one-third of his life—in resource homes. Minor experienced multiple negative interactions while in Mother's custody. Minor witnessed an incident of domestic violence between Mother and Father, and was then abandoned in a parking lot. The next month, Mother got drunk and fell asleep, leaving Minor to wander out in the street alone. After Minor was returned to her custody, Mother relapsed again and was unresponsive with Minor in her presence. Minor "appeared to be angry as evidenced by throwing things at [Mother], biting her stomach, and biting the sofa." This evidence contradicts any argument that Minor's attachment to Mother provided him "with a sense of security and stability." (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230.)

While Mother highlights the favorable observations of her supervised visits with Minor, there was substantial evidence showing he was "ambivalent, detached, or indifferent" to their relationship. (*B.D.*, *supra*, 66 Cal.App.5th at p. 1230.) The social worker testified that Minor did not have difficulty separating from Mother at the end of the visits and went readily to his resource parent. Minor, however, had "constantly sought his resource parent's approval, exhibited a desire to reunite with her immediately after school or daycare, and expressed anger when they were separated." (Cf. *In re D.P.* (2022) 76 Cal.App.5th 153, 167, 170 [reversing order terminating parental rights where juvenile court performed no analysis

17

of beneficial relationship exception and there was evidence that children had spent entire life with parents, "routinely asked when they would be coming home," and "were happier with [mother] than with the caretakers"].)  Minor's previous resource parents reported that he showed no signs of looking for his Mother.  At Minor's first doctor appointment, Minor "stayed with the resource parent and would not listen or go to [Mother]."

## C. Factors on Second Element

Mother also argues that the juvenile court erred on the second element by considering "improper factors," namely Mother's struggles with substance abuse and domestic violence.  But as the juvenile court explained, and Mother appears to concede, our Supreme Court has made clear that "[i]ssues such as those that led to dependency often prove relevant to the application of the exception. . . .  A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

*B.D.* offers a helpful point of comparison.  In that case, the appellate court reversed the order terminating parental rights because the juvenile court had erred on its analysis of the second element.  (*B.D.*, *supra*, 66 Cal.App.5th at p. 1231.)  The juvenile court had "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long-term and continued substance abuse" and "did not examine how the parents' continued substance abuse impacted the nature of the parent-child relationship."  (*Id.* at p. 1228.)  Here, unlike *B.D.*, the juvenile court explicitly considered Mother's substance abuse and domestic violence issues "to the extent that they have inevitably lessened a parental bond made and broken for the duration of the child's life."  And there was substantial evidence supporting

18

this consideration, given Minor had witnessed domestic violence and repeated incidents of substance abuse while in Mother's care.

### D. Third Element

Finally, Mother argues that the juvenile court did not perform either part of the analysis on the third element of the beneficial relationship exception: (1) determining whether terminating the attachment would be detrimental to Minor; and (2) balancing any detriment against the benefit of adoption. The record does not support this view. While not required to do so (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156), the juvenile court explicitly described the "lessened" and "broken" bond between Minor and Mother and found, in light of Minor's "needs," that "the benefits of adoption far outweigh [Minor's] relationship with Mother."

There was substantial evidence to conclude Mother had failed her burden on the factual predicates for this element. There was little evidence that Minor would experience significant material or emotional harm from terminating his relationship with Mother. Minor had expressed only once that he missed Mother, and appeared at least ambivalent about their relationship. Minor did not have difficulty separating from Mother and had bonded with his resource parents, whom he *did* have difficulty separating from. The record also supports the court's factual determination that Minor's needs would be benefited by adoption. Among other things, there was evidence that Minor's current placement had presented some challenges with attending his early intervention program. The social worker testified that Minor's paternal grandparents were aware of Minor's needs and had special education services available to them. Given the evidence for these factual determinations, we cannot conclude that the court's balancing constituted an abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

19

In sum, we conclude that the juvenile court did not err in declining to apply the beneficial relationship exception.

## DISPOSITION

The order terminating Mother's parental rights is affirmed.

_____
Markman, J.*

We concur:


_____
Richman, Acting P.J.


_____
Miller, J.


*In re J.C.* (A168283)


\* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


21